**James BRATKA, Plaintiff,**

v.

**ANHEUSER–BUSCH COMPANY, INC., Defendant.**

**No. C2–93–694.**

United States District Court, S.D. Ohio, Eastern Division.

Dec. 11, 1995.

Terence Miller, Porter, Wright, Morris & Arthur, Columbus, Ohio, for defendant.

Steve J. Edwards, Grove City, Ohio, for plaintiff.

### ORDER

GRAHAM, District Judge.

This matter is before the Court on the Plaintiff's Motion For Default Judgment And Motion To Show Cause Why Defendant Should Not Be Held In Contempt. Plaintiff asserts that defendant has violated this Court's previous discovery order of July 13, 1994 in which defendant was ordered to produce documents relevant to plaintiff's claim.

In this civil action, plaintiff James Bratka ("Bratka") asserts claims of bodily injury against his employer Anheuser–Busch Company, Inc. ("Anheuser–Busch") under state law alleging that he was injured in the course of his employment as a result of his exposure to certain chemicals. Plaintiff originally brought this action both individually and as a class action on behalf of every employee of defendant who was exposed to chemicals and thereby injured while employed by defendant. The Court denied class action status on September 19, 1994.

Bratka alleges that he sustained serious and disabling injuries to his pulmonary system as a result of his exposure to iodophor and that defendant caused him to be exposed to iodophor knowing that it was substantially certain to result in injury to him. Iodophor is a mixture of iodine and phosphoric acid. Defendant uses a commercially prepared solution of iodophor sold by Penotone Corpora-

tion under the trade name Rapidyne to maintain an aseptic environment in the manufacture of non-pasteurized beer. Iodophor is sprayed on and around the filling equipment during the canning process. Anheuser–Busch began producing non-pasteurized beer in 1989 and does so at eight of its breweries in the United States to wit: Columbus, Ohio, Fairfield, California, Houston, Texas, Baldwinsville, New York, Williamsburg, Virginia, Los Angeles (Van Nuys), California, Fort Collins, Colorado and Carterville, Georgia.

Bratka alleges that he was first exposed to iodophor in June, 1991 when he began doing maintenance work on machinery used in the aseptic production line at defendant's Columbus, Ohio brewery. He further claims that his injury manifested itself in January, 1992 when he experienced a cough and shortness of breath which culminated in a diagnosis of pneumonia in March of 1992. He was then hospitalized and has not returned to work since. His injury has been variously diagnosed as chronic obstructive pulmonary disease, hypersensitivity pneumonia and chemical pneumonia.

■ In order to recover in this action against his employer, plaintiff must prove: (1) knowledge by the employer of the existence of a dangerous process, procedure, instrumentality or condition within its business operation; (2) knowledge by the employer that if the employee is subjected by his employment to such dangerous process, procedure, instrumentality or condition, then harm to the employee will be a substantial certainty; and (3) that the employer, under such circumstances, and with such knowledge, did act to require the employee to continue to perform the dangerous task.

*Fyffe v. Jeno's, Inc.*, 59 Ohio St.3d 115, syllabus paragraph 1, 570 N.E.2d 1108 (1991).

This action was commenced in the Common Pleas Court of Franklin County, Ohio and was thereafter removed to this Court by the defendant pursuant to the federal removal statutes based upon diversity of citizenship. *See,* 28 U.S.C. §§ 1332, 1441(a), and 1446.

Plaintiff first attempted to obtain discovery of documents in defendant's possession when he filed this action on June 7, 1993. Plaintiff's First Request to Produce was served with the complaint and requested the defendant to produce and permit plaintiff to inspect and copy the following documents:

1.) Minutes, notes, summaries, or other documents of any and all meetings or conferences at any location where Defendant was present and which exposure to iodophore [sic] and/or phosphoric acid was discussed.

2.) Any handouts, summaries, pamphlets, instructional guides, or inter-office memorandums, other written documents which discuss exposure to iodophore [sic] and/or phosphoric acid.

3.) Any incident reports, investigations, written memorandums, or any other written documents that discuss complaints or allegations made by employees of defendant that employees were made ill, injured, or sick by exposure to any chemical while employed by Defendant regardless of location of the employee.

On August 9, 1993, defendant objected to the production of any documents requested by the plaintiff on the ground that the request was overly broad because it was not limited as to time or place. Plaintiff filed a motion to compel discovery on August 24, 1993. On October 28, 1993, United States Magistrate Judge Norah McCann King granted plaintiff's motion to compel discovery with regard to Branch One of his first request to produce, finding that: "This request is relevant to defendant's state of knowledge with respect to employee exposure to iodophor and phosphoric acid, and could reflect the incidence of employee health problems related to exposure to those chemicals." Order of October 28, 1993, p. 2. With regard to Branch Two, Magistrate Judge King reached the same conclusion finding: "This request also seeks information relevant to the consideration of plaintiff's individual claims, as well as to the class allegations contained in the complaint." With regard to Branch Three, Magistrate Judge King concluded that it was too broad because it was not limited to the chemicals at issue in this

case. Accordingly, the motion to compel was granted with respect to Branches One and Two and denied with regard to Branch Three.

On November 10, 1993, plaintiff served his Second Request to produce which was identical to Branch Three of his first request, except it was limited to reports of injuries resulting from exposure to iodophor, phosphoric acid and iodine.

On November 18, 1993, defendant filed a motion for reconsideration and/or clarification of Magistrate Judge King's order of October 28. In this motion, defendant continued to assert that it should only be required to produce documents from the brewery where plaintiff worked. Plaintiff responded by pointing out that the Magistrate Judge had ruled that all records of employee health problems related to exposure to iodophor were relevant and properly discoverable.

On December 21, 1993, Magistrate Judge King denied defendant's motion for reconsideration saying: "Defendant has failed to convince this Court that a material distinction exists between defendant's Columbus facility and its other facilities." Order of December 21, 1993, p. 3. Defendant was ordered to produce the documents within thirty days or by January 20, 1994.

On February 7, 1994, defendant notified plaintiff's counsel for the first time that it would provide the requested documents only if plaintiff's counsel consented to a protective order. Defendant tendered a protective order which would permit it to designate any discovery documents as confidential. Any document so designated could be disclosed only to plaintiff's counsel and others in his firm actually assisting him in discovery or trial preparation and plaintiff's experts. Such persons would be entitled to review the documents only if they signed an agreement to be bound by the terms of the protective order. The order required plaintiff's counsel to notify defense counsel of the identity of such persons within two weeks after they reviewed any documents designated as confidential. It required plaintiff's counsel to return all such documents to defense counsel after the conclusion of the action. It stipu-

lated that any violation of its terms would impose civil liability on the violator and would be considered a contempt of this Court "which may be the subject of civil and criminal penalty." Plaintiff's counsel refused to sign the protective order and defendant refused to produce the documents which it had been ordered to produce.

Magistrate Judge King attempted without success to resolve this dispute in discovery conferences held on March 16 and 30, 1994. In an order filed on April 5, 1994, she stated "No later than April 15, 1994 either the parties shall submit for the Court's approval an agreed protective order or defendant shall file a motion for a protective order." On April 15, defendant filed a motion for a protective order asserting that such an order was necessary to "protect its numerous trade secrets and related confidential information from being disclosed to the public." Motion for Protective Order, April 15, 1994.

On June 9, 1994, Magistrate Judge King granted defendant's motion for a protective order. On June 20, 1994, plaintiff filed a motion asking the Court to reconsider her decision. On June 29, 1994, the Court scheduled a hearing on plaintiff's motion for reconsideration. The scheduling order required defendant to bring to the hearing all documents responsive to plaintiff's discovery requests and to be prepared to show why they should be subject to a protective order.

The hearing commenced on July 11, 1994. At the hearing, defense counsel conceded that defendant's formula for its iodophor solution was not a trade secret (Tr. p. 6) but maintained that defendant's procedures for manufacturing non-pasteurized beer, including the manner in which it used iodophor, were trade secrets. After conducting an *in camera* review of the documents, the Court ordered the defendant to sort them into four categories: (a) documents not responsive to the discovery requests; (b) documents containing no claimed trade secret information; (c) documents wherein more than ten percent of the content was claimed to be trade secret information; and (d) documents wherein ten percent or less of the content was claimed to be trade secret information. With regard to

the last category, defendant was instructed to redact the content claimed to be trade secret information. The Court requested additional evidence supporting defendant's claim that the manner in which it used iodophor was a trade secret and the hearing was continued until July 13, 1994.

At the continued hearing of July 13, 1994, defense counsel conceded that only 150 out of 1,500 pages of discovery documents contained any claimed trade secrets. Defense counsel indicated that they had no evidence to support the earlier assertion that the manner in which iodophor was used in the manufacturing process was a trade secret. Defendant indicated that it was prepared to turn over all of the discovery documents to plaintiff's counsel without a protective order. Thereupon, the Court ordered defendant to turn over all of the discovery documents to the plaintiff.

The Court then reviewed the course of discovery and noted that defendant's actions had effectively stalled discovery for over a year. The Court concluded that defendant's position in resisting discovery was not substantially justified and ordered defendant to pay plaintiff's expenses and attorneys fees for all of the discovery proceedings after the filing of the initial motion to compel. After receiving evidence regarding the reasonable expenses incurred by plaintiff in pursuing discovery, the Court awarded plaintiff the sum of $3,393.75. *See* Order of September 19, 1994.

Thus, on July 13, 1994, the Court ordered defendant to produce all documents responsive to Branches One and Two of Plaintiff's First Request to Produce and Plaintiff's Second Request to Produce without a protective order, forthwith. All such documents should have been provided to plaintiff's counsel at the conclusion of the July 13, 1994 hearing.

On July 18, 1994, plaintiff's counsel wrote to defense counsel reporting that he had reviewed approximately 1,100 pages of the documents produced on July 13 and had found only three incident reports, even though some of the documents contained references to prior employee complaints at various breweries. On July 20, 1995, defense counsel replied, stating, "I have inquired fur-

ther of the company with regard to these specific matters and hope to be back with you quickly." On August 5, defense counsel produced another 66 documents which were said to be all of the documents responsive to Plaintiff's Second Request to Produce. On August 9, plaintiff's counsel again wrote to defense counsel advising that after reviewing the additional 66 pages, defendant's production of documents still appeared to be incomplete. Plaintiff's counsel again noted that some of the documents produced indicated that there were numerous employee complaints at various breweries as early as 1989, yet he had received no reports relating to the verification or investigation of those complaints. On August 11, 1994, defense counsel replied, stating, "I have forwarded your letter to company personnel and I will discern whether there are any additional incident reports which have not been previously provided to you." The next day, defense counsel wrote, "I have addressed this issue with company personnel and I have been informed that it is the company's belief that all documents which are responsive to your request have been produced." Nevertheless, on August 23, 1994, defense counsel without explanation, produced fourteen more pages of documents. This completed defendant's response to plaintiff's first and second requests for production of documents and its compliance with the Court's order of July 13, 1994.

In November of 1994, the Court scheduled this case for a final pretrial conference and for trial. After several adjustments, the final pretrial conference was scheduled on June 2, 1995 and trial was scheduled on July 31, 1995.

On April 18, 1995, after taking the depositions of Anheuser–Busch employees Edwin B. Katzenmeyer, Jr. and Brian McNelis, plaintiff's counsel wrote to defendant's counsel, stating:

"Both Katzenmeyer and McNelis have testified about prior employee complaints and seeing some type of documentation but these documents have not been turned over to me in discovery. From the testimony it seems that each brewery may have a file of these documents and I was

inquiring if each of these breweries have been checked for documents. I am also curious as to why no Baldwinsville documents have been produced since Katzenmeyer testified that he saw such documents." (Plaintiff's Exhibit Z).

Defendant's counsel replied on April 26, 1995, stating, "All of the breweries were canvased in an extraordinary attempt to obtain every document that was possible. While we missed a bunch of documents which are largely irrelevant because they were in the St. Louis archives, you now have those as well." (Plaintiff's Exhibit AA).

On May 2, 1995, plaintiff's counsel again complained about defendant's apparent failure to produce documents, stating:

Both Mr. McNelis and Mr. Katzenmeyer discussed nos. 8 and 9 of the notice, dealing with employee health problems and complaints as a result of the aceptic [sic] problem. Neither one could testify with specificity about any individual employees that had problems or which breweries had which problems. Mr. Katzenmeyer testified that he saw reports on the Ft. Collins people, but none of these have been produced. (Katz 47–48, 68–89). Mr. McNelis testified about written reports, yet none have been produced prior to Jim's injury except one person. (McNelis 107–108). Mr. Katzenmeyer testified that 4 to 5 people were hospitalized in Williamsburg, yet there has been only 1 incident report produced. Your own documents show complaints in Van Nuys, Fairfield, and Ft. Collins, yet I see no incident reports in the documents produced. (Plaintiff's Exhibit BB).

Again, on May 8, 1995, he wrote:

Finally, as I have indicated on at least two separate occasions, I do not believe your client has produced all the documents requested nor has it provided someone that can testify in all the areas that I have requested. If this is not handled, I will file another motion to compel. (Plaintiff's Exhibit CC).

On the same date, defense counsel wrote, "Your allegations ... are misleading and deceptive. You have been provided the accident (incident) reports that exist."

On May 26, 1995, defendant filed a motion for summary judgment. The motion was grounded on defendant's assertion that plaintiff had no evidence that defendant knew that his exposure to iodophor was dangerous or that injury was substantially certain to occur. The motion was supported by an affidavit from a physician who stated that he had conducted a literature search and found no medical articles or research discussing a relationship between exposure to iodophor and any type of respiratory or pulmonary problems.

During the first week of June, 1995, plaintiff's counsel received an anonymous telephone call alleging that a former employee of defendant's Fort Collins brewery had received a workers' compensation settlement for an injury caused by iodophor exposure. The caller furnished the employee's name, Linda Burchi, and the names of her attorney and her doctor. Defendant had not produced any documents relating to Ms. Burchi's claim.

On June 30, 1995, plaintiff filed the instant motion asserting that defendant had failed to comply with the Court's discovery order of July 13, 1994 by failing to provide copies of documents in its possession concerning complaints of other employees who claimed they were injured as a result of exposure to iodophor. The motion was supported in part by documents produced by defendant which reflected complaints by unidentified employees for which defendant had failed to provide any incident reports, accident reports or other documents. Plaintiff asserted that defendant had failed to provide any documents relating to the workers' compensation claim of Linda Burchi. Plaintiff's counsel further asserted that Harry Pettit, an employee of the Baldwinsville brewery, had informed him that a number of employees there had required medical treatment as a result of exposure to chemicals while working on the aseptic production line, but that defendant had produced no documents regarding any such incidents. Among the exhibits attached in support of the motion was a report by Mr. Katzenmeyer regarding his visit to the Baldwinsville brewery in February and March of 1990 to inves-

tigate employee complaints regarding air quality and airborne irritants. This report and an attached table of complaints (which included some which might be considered similar to plaintiff's) was obtained by plaintiff's counsel pursuant to a Freedom of Information Act request.

On July 6, 1995, plaintiff further supported his motion by filing the affidavits of Harry Pettit and Linda Burchi. Mr. Pettit's affidavit indicated that sometime after 1988 a number of employees at the Baldwinsville plant required medical treatment for difficulty in breathing after working on the aseptic line. Ms. Burchi's affidavit indicated that she had been employed at the Fort Collins brewery as an operator on the aseptic line; that in 1989 she began experiencing various symptoms, including shortness of breath; that her medical problems were eventually diagnosed as being caused by exposure to iodophor; that she filed a workers' compensation claim which was eventually settled by defendant; and that she believed that close to fifty other employees at the Fort Collins brewery had complained of similar symptoms after exposure to iodophor.

On July 14, 1995, defendant responded to plaintiff's motion asserting that it was groundless. Defendant justified its failure to provide discovery of documents relating to Ms. Burchi's workers' compensation claim on the grounds that she had acknowledged in her settlement that her illness was not work related. Defendant explained its failure to provide documents regarding Mr. Katzenmeyer's visits to the Baldwinsville brewery on the grounds that most of the individuals involved alleged complaints pertaining to substances other than iodophor.

On July 17, 1995, the Court held a hearing on the motion. At the hearing, plaintiff's counsel tendered additional exhibits in support of his motion, including the affidavit of Dennis Weitzel, an employee of the Fort Collins brewery, who stated that he was seen at the National Jewish Center for Immunology and Respiratory Medicine ("National Jewish Center") in Denver and was diagnosed as having industrial asthma as a result of his exposure to iodophor. Plaintiff also tendered the affidavit of Dr. Joseph Jarvis, a physician who was employed at the National Jewish Center between 1990 and 1993, and who stated that in 1990 and 1991 he examined a number of employees employed at the Fort Collins brewery who were complaining of various symptoms, including difficulty in breathing, as a result of their exposure to chemicals used in the aseptic brewing process. Dr. Jarvis related that he had met with Anheuser–Busch medical and management personnel at the Fort Collins brewery regarding employee safety issues and had discussed his concern about employees being exposed to iodophor and the symptoms which they experienced. Defendant had produced no records regarding Mr. Weitzel's complaint or Dr. Jarvis's meetings with Anheuser–Busch officials. Plaintiff also offered State of Colorado workers' compensation records regarding the claim of Linda Burchi which reflected that she had asserted an industrial injury referred to as occupational asthma arising out of her employment. These documents indicated that Ms. Burchi's claim was settled for the sum of $60,000 above and beyond any workers' compensation benefits that had been paid prior to the date of settlement. Ms. Burchi's first report of injury alleged that she was suffering from pleurisy and bronchitis aggravated by Rapidyne.

As a result of this hearing, the Court continued the trial of this case and reopened discovery for a period of sixty (60) days. A status conference was scheduled on September 15, 1995.

On September 1, 1995, defendant filed a memorandum to the Court. In this memorandum, defense counsel reported that as a result of the hearing of July 17, 1995 and plaintiff's allegations regarding the withholding of documents, defense counsel had made arrangements to personally visit every Anheuser–Busch brewery that utilized the aseptic process, as well as defendant's corporate offices in St. Louis, and had determined that "there are a number of additional documents which are responsive to the plaintiff's discovery requests which were not previously produced." Memorandum to the Court, September 1, 1995, pp. 3–4. Defense counsel expressed concern about providing copies of

documents which contained medical information relating to other employees.

At the status conference of September 15, 1995, counsel reported on additional depositions and document discovery which had occurred since the Court's July 17th order reopening discovery. The Court was informed that defendant had produced additional documents responsive to plaintiff's original requests to produce and subsequent requests. Defendant's counsel stated that they had been "taken completely by surprise by Mr. Edwards' production of the Linda Burchi documents" and that this caused them to conduct an investigation which revealed that certain documents had been "overlooked or not considered relevant or what have you." (Tr. pp. 8, 9). Defendant's counsel further reported that they had collected a large number of responsive documents which they had not yet produced because they contained medical information of employees other than the plaintiff. These documents included plant dispensary records and workers compensation claim files. Thereafter, on September 21, 1995, the Court entered an order requiring defendant to redact from the discovery documents any references to any medical or mental conditions other than complaints of injury or illness of the kind specified in plaintiff's request for production, to wit: complaints of dry eyes, scratchy throat, running nose, difficulty breathing, chest tightness, asthma-like symptoms or any other respiratory problems.

At the conclusion of the September 15, 1995 status conference, the Court scheduled a hearing on Plaintiff's Motion for Default Judgment and to Show Cause Why Defendant Should Not be Held in Contempt on October 3, 1995. On October 3 and 4, the Court heard testimony and received exhibits relating to the motion. Following the hearing, the Court ordered the defendant to produce various documents for the Court's inspection, including all of the documents produced in response to plaintiff's first and second requests and all documents produced pursuant to the Court's orders of July 13, 1994 and September 21, 1995. Thereafter, the Court ordered the parties to take and file a telephonic deposition of Bonnie Newton, the plant nurse at defendant's Fort Collins brewery.

The Court has now heard the testimony of defendant's trial counsel and in-house counsel who were responsible for the production of documents in response to plaintiff's requests and the Court's orders, and the testimony of the defendant's employees who created or had custody of defendant's records relating to employee complaints arising out of exposure to iodophor. The Court has reviewed over two thousand pages of documents, including all documents originally produced in response to plaintiff's first and second requests to produce and the Court's order of July 13, 1994 and all additional documents produced after plaintiff filed the instant motion and supported it with evidence that defendant's original production was incomplete.

The documents produced by defendant between July 13, 1994 and August 23, 1994 in response to plaintiff's first and second requests to produce and the Court's order of July 13, 1994 can be grouped into three major categories: (1) administrative reports, educational materials and safety procedures compiled by defendant in preparing for and in implementing aseptic production procedures; (2) air quality reports, OSHA reports of air quality investigations and industrial hygiene surveys conducted at several of the breweries where aseptic production had been implemented; and (3) approximately a dozen one-page chemical health advisory reports reflecting employee complaints of irritation of the eyes, nose. throat and lungs as a result of exposure to iodophor liquid or spray mist. Most of the documents which reflected specific employee complaints as a result of exposure to iodophor were from the Columbus and Williamsburg plants. There was one record of complaint from Van Nuys, California and three from Houston, Texas.

However, as plaintiff's counsel had pointed out repeatedly, there were indications in various other documents that there were other employee complaints which were not reflected in any of the documents produced. For example, a report entitled "Industrial Hygiene Evaluation of Iodophor Sterilization of Beer Filler Lines," dated October, 1990,

indicated that employees at both the Fairfield and Van Nuys, California plants had been complaining that the sterilization process was making them sick and that their symptoms included sore throats, headaches, shortness of breath and asthma-like symptoms. *See* Bates No. 340. Likewise, a report of air sampling at the Fort Collins brewery by the National Jewish Center in April, 1991, indicated that the test was done as a result of employee complaints associated with the aseptic lines. *See* Bates No. 66. An April 24, 1989 letter from Dr. Fred B. Groves of Greeley, Colorado to Brad Burdick, director of safety at the Fort Collins plant referred to an on site visit concerning "possible exposure to betadine [1] and phosphoric acid" and the doctor's examination of three employees who had complaints. *See* Bates No. 60. Furthermore, the Fort Collins records include a May 19, 1989 OSHA notice of safety and/or health hazards stating that employees are experiencing sore throats, irritated mucous membranes and nasal passages, breathing difficulties and rashes, after exposure to Rapidyne and iodophor. *See* Bates No. 96. Finally, a July 27, 1990 letter from the Penotone Corporation to Brian McNelis, defendant's manager of special projects, referred to worker complaints at "various plants." *See* Bates No. 961A.

The evidence offered by plaintiff in support of the instant motion and a review of the documents produced by defendant subsequent to the filing of the motion show that defendant failed to produce many highly relevant documents, including workers' compensation claims and medical reports relating to employee complaints of illness and injury arising out of exposure to iodophor. The documents which defendant failed to produce include a written proposal by National Jewish Center for an epidemiological study to investigate the consequences of iodophor exposure at the Fort Collins plant, which defendant rejected. The National Jewish Center proposal referred to respiratory complaints of Fort Collins employees (including one who experienced marked reactive airways disease) and identified Rapidyne as one of the suspected agents.

The records which defendant failed to produce include the medical records of nine employees at the Fort Collins plant who complained of symptoms similar to those complained of by plaintiff after they were exposed to iodophor. Each of these employees was examined by physicians at the National Jewish Center. Several of them filed workers' compensation claims.

The documents which defendant failed to produce included not only the above mentioned proposal from National Jewish Center, but also notes of meetings between Anheuser–Busch officials and National Jewish Center physicians in which the proposal was discussed. The meetings occurred on August 10, 1990 and February 11, 1991. Mr. Burdick's notes of the August 10, 1990 meeting indicate that it was attended by himself, Mr. Katzenmeyer and Bonnie Newton, the Fort Collins plant nurse and by Dr. John Martiney of the National Jewish Center. Burdick's notes indicate that the topics discussed included reactive airway dysfunction syndrome (RADS), industrial asthma and challenge testing for hyper-reactivity. Under the heading "Remedies," Burdick listed four possibilities, including "remove or replace Rapidyne." Burdick's notes of the February 11, 1991 meeting indicate that Ms. Newton was present as well as Dr. Martiney and Dr. Jarvis of National Jewish Center. According to these notes, seven cases were reviewed, including that of Linda Burchi. Burdick's notes of the meeting include the following comments:

Need to define early so we can diminish liability

—Is [sic] there irreversible changes

—We are in jeopardy because we have

a) Seven people report

b) Have had meetings

c) Screw up Burchi in long run by reexposure

Need to do some or all of the following:

1) Survey—talk W/KATZ

2) Rapidyne challenge on Burchi

3) Ind. Hygiene sampling

---

1. Betadine, like iodophor, is an iodine solution and anyone familiar with defendant's aseptic process would understand that term to be a reference to iodophor.

4) Have present cases go back for reeval. To see if returned to normal.

5) Put head back in sand.

The last entry is crossed out.

Among the Fort Collins records which were not produced is a memo from Mr. Burdick transmitting the National Jewish Center proposal to Mr. Katzenmeyer. This memo bears a handwritten notation, dated January 31, 1991 which states: "Ed *No way* Bob:." At the hearing of October 3, 1995, the individual who made this notation was identified as Robert Kelly, Anheuser–Busch's manager of corporate safety and health.

Records produced since the filing of the instant motion include scores of documents from defendant's Fairfield, California brewery which reflect respiratory complaints by employees who worked on the aseptic production line. The records document complaints from at least nineteen employees. Many of them were evaluated by allergists. In most cases, Rapidyne was a suspected cause of their symptoms, and in some instances, medical findings indicated that Rapidyne was indeed the cause. Among the records subsequently produced from the Fairfield brewery are documents indicating that all employees working on the aseptic production line were fitted with respirators as a result of the symptoms they reported and that an OSHA investigation was triggered as a result of their complaints about iodophor. Many of these employees complained of asthma-like symptoms. The medical records of Fairfield employee Rita Ransdell included pulmonary function studies interpreted as consistent with reactive airway disease and clinical testing demonstrated an adverse reaction to iodophor. Ms. Ransdell's records indicate that she was still complaining as late as March, 1994. Some of the employees were removed from the aseptic production line as a result of their complaints.

Contrary to the position taken in its original memorandum contra the instant motion filed on July 14, 1995, defendant now concedes that it did fail to produce scores of relevant documents, but it maintains that its failure to do so was inadvertent. The evidence adduced at the October 3, 1995 hearing revealed that defendant's response to plaintiff's requests for production of documents was prepared by a member of defendant's corporate legal department, associate general counsel Robert J. Bassett. In order to comply with Magistrate Judge King's order of December 21, 1993, Bassett sent a memo on December 29, 1993 to Dale Pendleton, defendant's corporate risk manager, requesting him to contact the breweries with aseptic lines and have them send their files to him as soon as possible. Bassett had already obtained documents from the Columbus brewery with the assistance of his paralegal, L.S. Albright. On January 3, 1994, Bassett sent another memo to Pendleton forwarding plaintiff's document requests and indicating that the Court had ordered production of documents responsive to Requests 1 and 2 from all breweries using iodophor.

On January 4, 1994, Pendleton sent an electronic mail message to the managers of each of the plants, advising that the Court had ordered production of "any handouts, summaries, pamphlets, instructional guides, or interoffice memorandums, other written documents which discusses exposure to iodophor and/or phosphoric acid." Copies of this electronic message were supposedly sent to "applicable plant safety specialists", but it is unclear who, if anyone, would have received an electronic message so addressed. Bassett did not ask Pendleton to collect documents responsive to Item 3 of plaintiff's requests for production because defendant's trial counsel, Charles Kurtz, had not informed him that plaintiff's counsel had served a second request for production of documents narrowing Item 3 to employee complaints as a result of exposure to iodophor. It is also to be noted that Pendleton's electronic message to the plant managers quoted only the text of item one of plaintiff's request for production of documents. It is defendant's position, however, that Item 1 of plaintiff's request was sufficiently broad to call for production of all documents contained in Items 1 and 2 of the original request and Item 3 as narrowed by the second request, or essentially all documents containing any reference to

exposure to iodophor.[2]

According to Bassett, he received documents from all seven of the breweries during the month of January, 1994 and they were copied and sent to defendant's trial counsel, Mr. Kurtz. Bassett testified that the documents appeared to be complete and responsive to the plaintiff's request. When Bassett sent the documents to his trial counsel, he instructed him to secure a confidentiality agreement for any documents produced. Thus, the defendant's insistence that it would produce the documents only if plaintiff's counsel agreed to a protective order originated with its in-house counsel, not its trial counsel. Bassett's instructions to his trial counsel do not mention trade secrets as a justification for a confidentiality agreement, and Bassett admitted at the hearing that he had no particular expertise in trade secret or intellectual property law and that he did not consult or confer with any other inside or outside counsel who had such expertise before initiating the request for a confidentiality agreement.

At Pendleton's request, Bassett personally reviewed the documents received from each brewery and prepared a report summarizing his findings. When plaintiff's counsel began to complain about the apparent incompleteness of defendant's production of documents shortly after he received them in July, 1994, trial counsel forwarded his letters on to Mr. Bassett stating, "I would suggest that you canvass each of the locations specifically so that we can give Mr. Edwards an honest answer before we have to give it to the judge." On July 25, 1994, Bassett sent a memo to Katzenmeyer advising him that the Court had ordered production of copies of all incident reports of employees who "claimed exposure and illness concerning iodophor" and warned him that the companies' failure to fully comply could expose it to sanctions. He asked Katzenmeyer to provide him with copies of all incident reports of which he was aware in order to assure compliance with the Court's order. In response to this memo, Katzenmeyer sent Bassett his file containing

chemical health advisory forms. Katzenmeyer had other files relating to iodophor and employee complaints but apparently sent Bassett only what had been specifically requested, to wit, incident reports. These documents were copied and sent to Attorney Kurtz for transmittal to plaintiff's counsel.

Although Anheuser–Busch is a large corporation, the persons who would have knowledge concerning the aseptic brewing process and employee complaints of illness or injury as a result of exposure to iodophor are few in number and readily identifiable. Mr. Katzenmeyer, the corporate industrial hygienist in St. Louis, had overall responsibility for employee complaints of illness and injury as a result of exposure to chemicals and was actively involved in monitoring employee complaints in connection with the new aseptic production procedures which were implemented in 1989. Brian McNelis was primarily responsible for the technical and engineering aspects of the new aseptic brewing process and would also be a primary source of information. In addition, each brewery which had an aseptic production line had its own health and safety manager and each brewery had a registered nurse who was responsible for employee health care. When Bassett asked Pendleton to obtain the records from the breweries, he failed to ask Katzenmeyer for his records. Pendleton testified that it was his understanding that Bassett himself would obtain Katzenmeyer's records and that his own responsibility would be limited to obtaining the documents from the individual plants. Bassett's failure to request documents from Katzenmeyer in January was a serious error since Katzenmeyer was the one person likely to have the most information relevant to plaintiff's discovery requests. Bassett was well aware of this inasmuch as he had previously asked Katzenmeyer to give an affidavit which was used to oppose plaintiff's motion for class action certification. In this affidavit, Katzenmeyer stated:

2. Nevertheless, trial counsel's inexcusable failure to timely notify defendant of Plaintiff's Second Request to Produce may have played some role in what occurred. Correspondence from Bassett

to Kurtz shows that as late as July 29, 1994, Bassett was still under the impression that defendant was not required to produce incident reports.

... I am currently Senior Manager of Industrial Hygiene, Corporate Safety and Risk Management Department.

3. My duties include and largely comprise the anticipation of and solving whatever occupational health problems may arise. In this capacity, among other duties, I visit the locations of the company, sample air, measure noise, evaluate ventilation and otherwise take those steps necessary to ensure the safety of our employees.

\* \* \* \* \* \*

5. I am familiar with the case wherein Mr. James Bratka alleges that he was exposed to iodophor in January, 1992 and contracted pneumonia in March, 1992. If similar events transpired in the corporate environment of Anheuser–Busch, I would have been notified of them in the normal course of business.

When Pendleton requested records from the breweries, he directed his request to the plant manager but he did not specifically advise the plant health and safety managers or the plant nurses of his request. It is unlikely that his electronic mail communication would have been transmitted to the computer terminal of each plant health and safety manager and it appears in fact that the health and safety managers at the Fort Collins and Fairfield, California plants did not receive Pendleton's request.

When plaintiff's counsel began complaining about the apparent incompleteness of the documents, Bassett contacted Katzenmeyer. However, he only requested incident reports and that is all Katzenmeyer provided. As it turns out, Katzenmeyer's filing system included three separate sources of information regarding employee complaints arising out of exposure to iodophor, but Bassett succeeded in retrieving documents from only one of these files. It does not appear that Bassett took any steps to recheck the manner in which Pendleton had carried out his assignment to retrieve documents from the breweries. Had he done so, he would have discovered that at least two of the plant safety managers had not been made aware of the document request. Based on the documents Bassett reviewed in January of 1994, it

should have been obvious to him that the plant safety manager at the Fort Collins brewery, Mr. Burdick, likely had additional information and documents.

Rule 37(b)(2) provides in part as follows:

**(2) Sanctions by Court in Which Action is Pending.** If a party or an officer, director, or managing agent of a party or a person designated under Rule 30(b)(6) or 31(a) to testify on behalf of a party fails to obey an order to provide or permit discovery, including an order made under subdivision (a) of this Rule or Rule 35, or if a party fails to obey an order entered under Rule 26(f), the court in which the action is pending may make such orders in regard to the failure as are just, and among others· the following:

(A) An order that the matters regarding which the order was made or any other designated facts shall be taken to be established for the purposes of the action in accordance with the claim of the party obtaining the order;

(B) An order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting that party from introducing designated matters in evidence;

(C) An order striking out pleadings or parts thereof, or staying further proceedings until the order is obeyed, or dismissing the action or proceeding or any part thereof, or rendering a judgment by default against the disobedient party;

(D) In lieu of any of the foregoing orders or in addition thereto, an order treating as a contempt of court the failure to obey any orders except an order to submit to a physical or mental examination;

■ In selecting a sanction under Rule 37, a court may properly consider both punishment and deterrence. *National Hockey League v. Metropolitan Hockey Club,* 427 U.S. 639, 643, 96 S.Ct. 2778, 2781, 49 L.Ed.2d 747 (1976); *Patton v. Aerojet Ordnance Co.,* 765 F.2d 604, 607 (6th Cir.1985).

Plaintiff urges the Court to impose the sanction of default judgment. Such a sanction would equal in severity the sanction of

dismissal where the offending party was the plaintiff. *See, Bank One of Cleveland N.A. v. Abbe,* 916 F.2d 1067, 1073 (6th Cir.1990). With regard to such a sanction, the Supreme Court held in *Societe Internationale Pour Participations Industrielles et Commerciales, S.A. v. Rogers,* 357 U.S. 197, 212, 78 S.Ct. 1087, 1096, 2 L.Ed.2d 1255 (1958), that Rule 37

> should not be construed to authorize dismissal of [a] complaint because of petitioner's noncompliance with a pretrial production order when it has been established that failure to comply has been due to inability, and not to willfulness, bad faith, or any fault of petitioner.

While the Supreme Court did not define the precise degree of fault which would warrant extreme sanctions, this issue was addressed by the United States Court of Appeals for the Second Circuit in the case of *Cine Forty–Second St. Theatre Corp. v. Allied Artists Pictures Corp.,* 602 F.2d 1062, 1067 (2d Cir. 1979), where the court said:

> Unless we are to assume that the Court chose its words carelessly, we must accord the term "fault" a meaning of its own within the *Societe Internationale* triad. And plainly, if "fault" has any meaning not subsumed by "willfulness" and "bad faith," it must at least cover gross negligence of the type present in this case.

The court went on to note, *Id.:*

> Negligent, no less than intentional, wrongs are fit subjects for general deterrence, ... And gross professional incompetence no less than deliberate tactical intransigence may be responsible for the interminable delays and costs that plague modern complex lawsuits.

Adopting the phraseology of the Supreme Court in *Societe Internationale,* the Sixth Circuit has consistently referred to the same three levels of culpability which may warrant the imposition of extreme sanctions. *See* cases discussed *infra.* Like the court in *Allied Artists,* this Court concludes that in this context fault would least include gross negligence.

In *Regional Refuse Systems, Inc. v. Inland Reclamation Co.,* 842 F.2d 150, 154 (6th Cir.1988), the court cited with approval a decision of the federal circuit which held that the burden of proof is on the sanctioned party to establish that the failure to comply was due to inability and not to willfulness, bad faith or any fault of the party. The court followed this rule in *Taylor v. Medtronics, Inc.,* 861 F.2d 980, 987 (6th Cir.1988) and *Beil v. Lakewood Engineering & Manufacturing Co.,* 15 F.3d 546, 552 (6th Cir.1994).

In *Taylor,* the court enumerated three factors which a court should consider in imposing sanctions under Rule 37, to wit: (1) whether the adversary was prejudiced by the sanctioned party's failure to cooperate in discovery; (2) whether the sanctioned party was warned that failure to cooperate could lead to dismissal; and (3) whether less drastic sanctions were imposed or considered. 861 F.2d at 986.

Based on the evidence before it, the Court finds that defendant's failure to comply with plaintiff's discovery requests and the Court's discovery order of July 13, 1994 was a result of gross negligence. The Court further finds that defendant has failed to show that it made a good faith effort to provide the required discovery. The evidence would support a finding of willfulness but the evidence of willfulness is circumstantial and the Court is reluctant to make such a finding on the basis of circumstantial evidence. Nevertheless, defendant's lack of diligence in planning and executing an effective search for the relevant documents evidences the absence of good faith, and a lack of respect for the seriousness of its duties under the Federal Rules of Civil Procedure and the importance of full and fair discovery under the Rules. Defendant's lack of diligence not only caused substantial delay, expense and inconvenience, but also threatened the reliability of the fact-finding process which is essential to the court's ability to ensure that cases are decided on their merits after consideration of all relevant evidence bearing on the party's claims.

■ Trial counsel permitted the defendant, through its general counsel's office, to undertake total responsibility for compliance with plaintiff's discovery requests and the Court's discovery order. This was no doubt

in accordance with defendant's wishes. The Court recognizes that corporate defendants with in-house legal departments often attempt to mitigate the cost of litigation, particularly the expense attendant to discovery, by using in-house counsel to assist trial counsel. While there is nothing inherently wrong with this, it is clear that in order to avoid the kind of problems which occurred in the instant case, trial counsel must exercise some degree of oversight to ensure that their client's employees are acting competently, diligently and ethically in order to fulfill their responsibility to the Court.

The Court expects that any trial attorney appearing as counsel of record in this Court who receives a request for production of documents in a case such as this will formulate a plan of action which will ensure full and fair compliance with the request. Such a plan would include communicating with the client to identify the persons having responsibility for the matters which are the subject of the discovery request and all employees likely to have been the authors, recipients or custodians of documents falling within the request. The plan should ensure that all such individuals are contacted and interviewed regarding their knowledge of the existence of any documents covered by the discovery request, and should include steps to ensure that all documents within their knowledge are retrieved. All documents received from the client should be reviewed by counsel to see whether they indicate the existence of other documents not retrieved or the existence of other individuals who might have documents, and there should be appropriate follow up. Of course, the details of an appropriate document search will vary, depending upon the circumstances of the particular case, but in the abstract the Court believes these basic procedures should be employed by any careful and conscientious lawyer in every case.

Here, trial counsel essentially abdicated all responsibility to the client's in-house counsel. At the very least, when plaintiff's counsel began complaining about the apparent incompleteness of the discovery documents and pointing to evidence of incompleteness, trial counsel should have established direct communication with defendant's employees who had responsibility for its aseptic production process and employee health and safety.

Defendant's associate general counsel, Bassett, was grossly deficient in his efforts to obtain all of the documents responsive to plaintiff's discovery requests and the Court's order of July 13, 1994. He assigned responsibility for obtaining the records from the plants other than Columbus to a non-lawyer, without specific instructions or supervision. Pendleton's message to the plant managers requesting the documents was incomplete and potentially confusing. It could be construed to refer only to safety and instructional documents and indeed that is the bulk of what was received from the plants. He did not request reports of injuries or complaints of illness. He did not direct the request to the plant safety managers by name. Bassett received a copy of Pendleton's request to the plants but never acted to correct these deficiencies. As a result, hundreds of relevant documents were not obtained or produced. Bassett told Pendleton that he would obtain the records from the single most important source, Katzenmeyer, but unaccountably, he never requested any records from Katzenmeyer until after plaintiff's counsel complained about the apparent incompleteness of the records produced. Even then, he did not meet with Katzenmeyer or even communicate with him personally. Instead, through a secretary, he requested one specific kind of document, namely incident reports, thus leaving uncollected and unproduced the vast majority of Katzenmeyer's records and documents relating to iodophor and employee complaints relative thereto. Bassett knew that Katzenmeyer was the person most likely to have significant information regarding employee complaints relating to iodophor. Bassett had contacted Katzenmeyer to obtain the affidavit to oppose plaintiff's motion for class action certification in the early stages of this litigation. Bassett's failure to personally interview Katzenmeyer regarding his knowledge of records within the scope of plaintiff's discovery requests and the Court's order of July 13, 1994 was gross negligence and evidenced a lack of good faith in discharging the responsibility he had undertaken as a lawyer to ensure that his client complied with the

Federal Rules of Civil Procedure and the order of this Court.

Plaintiff was clearly prejudiced by defendant's failure to produce relevant documents within its possession. The documents which defendant failed to produce contained evidence highly relevant to plaintiff's claim that his employer knew of the existence of a dangerous process within its business operation which he was exposed to in the course of his employment. In preparing for trial, plaintiff was unable to furnish his expert witnesses with the reports from the National Jewish Center doctors who examined Anheuser-Busch employees who had been exposed to iodophor at the Fort Collins brewery, or the reports of the doctors who had examined employees at defendant's Fairfield, California brewery who complained of various symptoms after exposure to iodophor. This case was only a few weeks away from trial when an anonymous telephone call provided the proof that defendant had failed to produce highly relevant documents, and but for that anonymous telephone call, plaintiff would have been forced to trial without the benefit of highly relevant evidence which remained hidden in defendant's files.

Plaintiff was faced with a motion for summary judgment supported by the affidavit of a physician retained by defendant who stated that he was unable to find any medical literature discussing the relationship between exposure to iodophor and any type of respiratory or pulmonary problems. Defendant's files contained numerous medical reports discussing that subject as well as a proposal from a highly respected medical center which specialized in immunology and respiratory medicine for an epidemiological study of iodophor which defendant rejected.

Defendant's actions which give rise to the present motion are not an isolated event. To the contrary, defendant has unreasonably obstructed, complicated and delayed discovery from the very beginning of this litigation. Defendant's objection to branches one and two of plaintiff's first request to produce documents was unfounded, as was its motion for reconsideration of the magistrate judge's order overruling the objection and compelling discovery. After twice being ordered to produce the records, defendant refused to do so unless plaintiff agreed to a protective order. This resulted in a further prolonged discovery dispute which culminated in defendant's admission that only ten percent of the documents contained any purported trade secrets and the admission that it had no evidence to support its contention that the manner in which it used iodophor was a trade secret. Defendant ultimately abandoned its request for a protective order, even for the few records that it claimed contained trade secrets.

Defendant was repeatedly advised that its response to the Court's Order of July 13, 1994 appeared to be incomplete but defendant continued to insist that it had produced all relevant documents. When plaintiff's counsel filed the instant motion, he was met with threats of sanctions and accused of making knowing misrepresentations to the Court. *See,* Defendant Anheuser-Busch's Memorandum Contra Plaintiff's Motion For Default Judgment and Motion to Show Cause Why Defendant Should Not be Held in Contempt (Docket 102). This memorandum was filed after defendant had been confronted with the evidence of its failure to produce records relating to the workers' compensation claim of Linda Burchi. In this memorandum, defense counsel offered a spurious justification for defendant's failure to produce Ms. Burchi's records. Defendant later conceded that it should have produced Ms. Burchi's workers' compensation records in response to plaintiff's requests and the Court's order of July 13, 1994.

After the filing of the instant motion, defendant gathered the records it had previously failed to produce and obtained the Court's direction regarding the production of employee medical records. It then failed to separate out the responsive from the nonresponsive documents and delivered over one thousand pages of irrelevant nonresponsive documents to plaintiff's counsel, presenting him with the tedious and time-consuming task of separating the relevant from the irrelevant. *See,* Order of October 31, 1995, paragraph four and defendant's memoran-

dum in response filed on November 17, 1995.[3] Whether this was an attempt to "hide the needle in the haystack", to overwhelm plaintiff's counsel with hours of unnecessary work, to impress the Court with the sheer number of documents produced, or just another example of defendant's negligence is a moot question.

Defendant was well aware that its failure to cooperate in discovery could result in the imposition of sanctions. The Court had already imposed monetary sanctions in its order of July 13, 1994. Plaintiff's counsel warned defendant of potential sanctions. Defendant's trial counsel likewise warned defendant of potential sanctions, and defendant's own internal communications indicate an awareness that its failure to respond with all appropriate documents could subject the company to significant liability. Thus, defendant well knew that its failure to properly discharge its duties with respect to discovery could result in the imposition of significant sanctions.

■ Defendant's negligence and lack of good faith have prolonged this litigation, increased the time and expense to plaintiff and has required an inordinate amount of the Court's time which has detracted from its ability to give timely attention to other important cases on its docket. The Court concludes that defendant's gross negligence and lack of good faith in complying with plaintiff's discovery requests and the Court's discovery order of July 13, 1994 warrants the imposition of extreme sanctions.

The Court has considered the range of sanctions that might be appropriate in this case. The Court concludes that an award of fees and expenses alone would not be a sufficient sanction. Such a sanction was imposed at an earlier stage of this litigation but apparently failed to impress the defendant with the seriousness of its responsibilities. The Court also believes that deterrence is an important consideration in selecting the sanction in this case. Here, a major American corporation has failed to discharge in good faith its duties under the discovery provisions

of the Federal Rules of Civil Procedure, as implemented by a specific order of this Court. If litigants are to have any faith in the discovery process, they must know that parties cannot fail to produce highly relevant documents within their possession with impunity. Parties cannot be permitted to jeopardize the integrity of the discovery process by engaging in halfhearted and ineffective efforts to identify and produce relevant documents.

In this case, a default judgment on the issue of liability would not only serve the purposes of punishment and deterrence but it would also have a direct relationship to the specific evidence which defendant failed to produce, namely evidence relevant to the issues of defendant's fault and the proximate cause of plaintiff's injury. Accordingly, the Court will grant plaintiff's motion for sanctions in the form of a default judgment on the issue of liability, and the following facts shall be taken to be established for the purposes of this action: (1) defendant knew that the spraying of iodophor in its aseptic canning process was dangerous to the plaintiff, (2) defendant knew that if plaintiff was subjected to this dangerous process that harm to him would be a substantial certainty, (3) that under these circumstances and with such knowledge, defendant did act to require James Bratka to continue to perform tasks which exposed him to this danger and (4) that as a proximate result, James Bratka did sustain injuries to his pulmonary system which have been variously diagnosed as chronic obstructive pulmonary disease, hypersensitivity pneumonia and chemical pneumonia. The issues remaining for trial will be the nature and extent of plaintiff's injury and the consequences thereof and the amount of compensatory damages he is entitled to recover and the amount of punitive damages, if any, which the jury may award.

As an additional sanction defendant shall pay to plaintiff his reasonable attorneys' fees and expenses incurred in connection with the instant motion. Plaintiff's counsel shall file

---

**3.** The documents included records of employees who had orthopedic injuries and other conditions which had no relationship whatsoever to exposure to chemicals.

an appropriate affidavit supporting his claim for attorneys' fees and expenses.

It is so ORDERED.