In re **CONNOLLY NORTH AMERICA, LLC, Debtor.**

**Mark H. Shapiro, Trustee of the Chapter 7 Bankruptcy Estate of Connolly North America, LLC, Plaintiff,**

v.

**Plante & Moran, LLP, a Michigan Limited Liability Company, Defendant.**

Bankruptcy No. 01–57090.
Adversary No. 02–4725.

United States Bankruptcy Court,
E.D. Michigan,
Southern Division.

Oct. 9, 2007.

Stephen M. Landau, Bingham Farms, MI, for Plaintiff.

Michael W. Hartmann, Detroit, MI, for Defendant.

## OPINION GRANTING DEFENDANT PLANTE & MORAN, LLP'S MOTION TO DISMISS AND DENYING OTHER REQUESTED SANCTIONS

THOMAS J. TUCKER, Bankruptcy Judge.

This is a complex accounting malpractice action brought by Mark H. Shapiro, the

Chapter 7 trustee of the estate of the debtor, Connolly North America, LLC, against Plante & Moran, LLP ("Plante Moran"). The Trustee seeks damages of approximately $4.8 million, for alleged malpractice by Plante Moran in its 2001 audit of Connolly's financial statements for the year ended December 31, 2000.[1]

The Court began a jury trial on May 17, 2005.[2] But on June 3, 2005, the ninth day of trial, the Court was forced to grant a mistrial, on a motion by Plante Moran. The mistrial was required when it came to light, during trial, that the Trustee had failed to properly disclose and produce in discovery some 36 bankers boxes of documents, containing many documents that Plante Moran had requested two and one-half years earlier. The Trustee and his attorney, Stephen M. Landau, had stated in discovery responses, in several motion papers, and in the Trustee's testimony to the jury at trial, *erroneously*, that the Trustee had discarded these documents to save storage expense.

Plante Moran moved to dismiss this case and for monetary sanctions, claiming intentional discovery misconduct by the Trustee and his attorney, or in the alternative, claiming discovery violations that were the product of gross negligence by the Trustee and his attorney. The parties engaged in discovery relevant to this motion and briefed it extensively. The Court held a lengthy hearing and took the matter under advisement.

In this opinion, the Court concludes (1) that both the Trustee and his attorney breached their obligations under the dis-

---

1. (*See* Final Pretrial Order, filed April 4, 2005 at 2, 45–46 (Docket # 68)).

2. The parties consented to the bankruptcy court conducting the jury trial, as permitted

by 28 U.S.C. § 157(e) and the district court's Local Rule 83.50 and its Administrative Order No. 96–AO–023 (February 7, 1996).

covery rules; (2) that while these breaches were not intentional or done in bad faith, they were the product of gross negligence by both the Trustee and his attorney; and (3) that the proper remedy is dismissal of this action with prejudice.

For the reasons stated in this opinion, the Court will grant Plante Moran's motion to dismiss the Trustee's claims with prejudice, but will deny Plante Moran's request for monetary sanctions.

## I. Background and Facts

### A. The Connolly North America bankruptcy case

On September 5, 2001, an involuntary bankruptcy petition was filed against Connolly North America, LLC (referred to in this opinion as "Connolly" or "CNA"). CNA resisted the involuntary bankruptcy, but ultimately the Court entered an order for relief on December 17, 2001. Even before the order for relief was entered, the Court ordered the appointment of an interim trustee, on October 31, 2001.

### B. The Trustee and his professionals

On November 9, 2001, Mark H. Shapiro was appointed as interim trustee. Shortly after his appointment, the Trustee sought and obtained the Court's approval to employ various professionals. These professionals included: Jeffrey A. Divian and Conway, McKenzie & Dunleavy as accountants for the Trustee,[3] and the Trustee's own firm, Steinberg, Shapiro and

Clark (formerly known as Steinberg & Shapiro) as counsel for the Trustee.[4]

In early 2002, the Trustee obtained the Court's approval to employ several special counsel. On February 6, 2002, the Court approved the employment of Gregory D. Hanley and his firm, Wasinger, Kickham, and Hanley, as special counsel to assist in the collection of CNA's accounts receivable.[5] On March 14, 2002, the Court authorized the employment of Stephen M. Landau as special counsel regarding a potential accounting malpractice action against Plante & Moran, LLP.[6]

### C. This adversary proceeding

On May 22, 2002, the Trustee filed this adversary proceeding against Plante Moran. In his complaint, the Trustee alleged that Plante Moran committed accounting malpractice in connection with a pre-petition audit performed by Plante Moran of CNA's financial statements for the year ended December 31, 2000. The Trustee demanded a jury trial.

### D. The Trustee's 2003 discovery responses

On October 17, 2002, Plante Moran served its first document request on the Trustee.[7] Request number three asked the Trustee to produce numerous documents relevant to the Trustee's malpractice claim, namely:

Copies of the following documents, separately for each of Connolly North Amer-

---

3. (Docket # 53 in CNA bankruptcy case # 01–57090).

4. (Docket # 61 in CNA bankruptcy case # 01–57090).

5. (*See* "Order Authorizing Trustee's Employment of Special Counsel") (Docket # 106 in CNA bankruptcy case # 01–57090).

6. (*See* "Order Authorizing Trustee's Employment of Special Counsel") (Docket # 120 in CNA bankruptcy case # 01–57090).

7. (*See* First Document Request (Docket # 135, Ex. 3, "Appendix of Exhibits to Brief Supporting Plante & Moran, LLP's Motion to Dismiss and Award Sanctions" (hereinafter Part 3, App. Ex. to Br.))).

ica, LLC and Connolly North America Finishing, LLC:

a. Detail monthly general ledgers for October 2000 through August 2002;

b. Monthly interim financial statements for all of 2000, 2001, and 2002;

c. All adjusting journal entries for 2000, 2001, and 2002;

d. Bank statements for all bank accounts from January 1, 2000 through August 2002;

e. Accounts receivables listings for each month from October 2000 through August 2002;

f. Monthly cash receipts listing for each month from October 2000 through August 2002;

g. Internal accounting analyses for collectibility of account receivables for all periods prepared during 2000, 2001 and 2002;

h. All correspondence with customers relating to account receivables outstanding as of December 31, 2000 including collection matters, billing and pricing problems, quality issues, and any other contract disputes;

i. Inventory information:

1. Monthly perpetual inventory listing[;]

2. Priced physical inventory listings for all dates in 2000 and 2001 at which a physical inventory was taken[;]

3. Inventory count tags for each physical inventory;

4. Reconciliation between the general ledger and physical count for each inventory date;

5. Any and all information related to the claim that the actual inventory of the company was different than the inventory presented in the December 31, 2000 audited financial statements including:

a. The amount the actual inventory is purported to be, including individual quantities and prices;

b. How it was determined;

j. Monthly unpaid accounts payable listings for 2000 through 2002;

k. Monthly detail of accrual accounts payable for each month of 2000 through 2002;

l. Material purchases records from June 2000 through December 2001;

m. All documents supporting cost of sales for 2000 as recorded in the company's accounting records. The same supporting alleged understated amount.

Through his counsel, the Trustee responded to this document request on January 16, 2003, indicating that he did not have many of the documents requested by Plante Moran. The response also stated, at the end, that the Trustee had 38 bankers boxes of *accounts receivable files*. The response stated:

Contemporaneously with the service of this response, a CD entitled "General ledger" will be hand delivered to counsel for defendant. This CD is believed to contain all known accounting records of the debtor. No privilege is asserted with regard to the contents of the CD. **The trustee believes, as set forth in this response, but exclusive of the records of defendant, that no hard, *i.e.*, paper copies or originals, are in existence.**

**The only other known business or accounting records of the debtor are contained within 3 other CD's entitled "Jansen's CD", "Shapiro's CD" and "Lychos file" and in a single box of miscellaneous accounting documents in the possession of Conway, MacKenzie & Dunleavy,** which latter documents may be viewed during normal business hours upon 2 business days'

notice to the undersigned. Contemporaneously with the service of this response, those CD's will be hand delivered to counsel for defendant. Mr. Lychos and Mr. Jansen were employed by the debtor subsequent to the termination of Mr. Garner. The Lychos CD is believed to be a complete copy of the entire file of Mr. Lychos with respect to the debtor. The Shapiro CD contains minimal accounting records of the debtor including documents apparently produced by defendant during the Garner litigation. **Though "minimal," these are all of the accounting or business records in the possession of the trustee which relate to this litigation.**

**To the extent that this request seeks documents which the debtor placed in its accounts receivables files, those files, consisting of 38 banker's boxes, may be viewed during normal business hours at the offices of Wasinger, Kickham & Hanley, PC, in Royal Oak, Michigan, upon 2 days' notice to the undersigned.**[8]

The Trustee's attorney Stephen Landau signed this response.

On February 5, 2003, Plante Moran served the Trustee with its first set of interrogatories.[9] The interrogatories sought information regarding the Trustee's lack of documents. The Trustee's interrogatory answers were dated March 25, 2003, were signed only by the Trustee's attorney, Stephen Landau, and were not under oath as required by Fed.R.Civ.P. 33(b)(1). The answers confirmed that the Trustee did not have many of the documents requested by Plante Moran, and

that he had few requested documents in paper form. And in his answers to interrogatory nos. 1(H) and 1(I), and 2(H) and 2(I), the Trustee again indicated that the paper documents contained in the 38 bankers boxes at attorney Greg Hanley's office were only *accounts receivable records:*[10]

Interrogatory No. 1: Please state whether any of the following documents still exist in any form?

A. Interim financial statements prepared by Connolly for the years 2000 and 2001.

***Answer:* Interim financial statement for the year 2000—none. For the year 2001—yes.**

B. The physical inventory prepared by Connolly for the year ended December 31, 2000.

***Answer:* Physical inventory for the year 2000—yes, but only the summary contained in the audit workpapers.**

C. The physical inventory prepared by Connolly for the period ended June 30, 2001.

***Answer:* Physical inventory for June 2001—yes, but only the inventory valuation report and reconciliation.**

D. Accounts receivable listings for each month from October 2000 through 2001.

***Answer:* Accounts receivable listings [agings] for December, 2000 and March and September, 2001 only.**

E. Any documents related to unvouchered payables in 2000 and 2001.

---

8. (*See* First Document Request (Docket # 135, Ex. 3, Part 3, App. Ex. to Br.)) (bold emphasis added). On January 22, 2003 the Trustee filed a proof of service stating that he served this response on January 16, 2003 (Docket # 18).

9. (*See* Trustee's "Answers to First Interrogatories" (Docket # 135, Ex. 4, Part 3, App. Ex. to Br.)).

10. (*See id.*) (bold emphasis added).

*Answer:* Unvouchered payables documents for 2000—yes, but only the schedule contained in the audit workpapers. For 2001—only per general ledger and reconciliation schedule January through June, 2001.

F. The payables files for 2000.

*Answer:* Payable files for 2000—none.

G. The payable files for January through September of 2001.

*Answer:* Payable files for 2001 through September—none.

H. Correspondence between Connolly and Lear, Visteon and JCI.

*Answer:* Correspondence between Connolly and Lear, Visteon and JCI—yes as to correspondence related to accounts receivable.

I. Correspondence between Connolly and its principal customers.

*Answer:* Correspondence between Connolly and its principal customers—yes as to correspondence related to accounts receivable.

J. Any records printed from the perpetual inventory system.

*Answer:* Perpetual inventory—none.

K. Bank statements for 2000 and 2001.

*Answer:* Bank statements—yes, but only select pages for November and December, 2000.

L. Bank reconciliations for 2000 and 2001.

*Answer:* Reconciliations for December, 2000 and August, 2000 through June, 2001 but these are records prepared by Michael Jansen.

M. Adjusting journal entries for 2000 and 2001.

*Answer:* Adjusting journal entries— only as proposed in the audit.

N. Invoices from material suppliers for the years 2000 and 2001.

*Answer:* Materials supplier invoices—none.

O. Documents supporting cost of sales for the year 2000.

*Answer:* 2000 cost of sales supporting documents—only as contained in the audit workpapers.

Interrogatory No. 2: If the answer to any of the subparts of Interrogatory No. 1 is yes, with respect to each subpart please identify the current location and form of any such documents.

*Answer:*

A. In electronic format. In the possession of defendant.

B. In electronic format. In the possession of defendant.

D. In electronic format. In the possession of defendant.

E. In electronic format. In the possession of defendant.

G. In electronic format. In the possession of defendant.

H. In hard copy. In the possession of Greg Hanley and available for inspection and copying at ay time during normal business hours upon notice.

I. In hard copy. In the possession of Greg Hanley and available for inspection and copying at ay time during normal business hours upon notice.

K. In electronic format. In the possession of defendant.

L. In electronic format. In the possession of defendant.

M. In electronic format. In the possession of defendant.

O. **In electronic format. In the possession of defendant.**

Interrogatory No. 3: If the answer to any of the subparts of Interrogatory No. 1 is no, please state with respect to each subpart:

A. Whether the documents ever existed;

B. Whether the documents were destroyed;

C. When the documents were destroyed;

D. Who authorized the destruction of the documents;

E. Why the documents were destroyed.

*Answer:* **Plaintiff lacks knowledge or information sufficient to respond to this interrogatory.**

Within weeks of receiving the Trustee's 2003 discovery responses, Plante Moran took the Trustee's deposition to find out what happened to the CNA records. During his deposition, the Trustee admitted that he authorized the destruction of some CNA records.

E. **The Trustee's 2003 discovery responses were both erroneous and misleading, and failed to properly disclose and produce some 36 bankers boxes of requested and relevant documents.**

When the Trustee responded to Plante Moran's document request and interrogatories in 2003, the records in his possession were far more extensive than he disclosed or produced. We now know that the Trustee actually had some *36 bankers boxes* of CNA "operating records and books in paper form" for the years 2000 and 2001, which he did not disclose or produce.[11]

As noted above, the Trustee's discovery responses disclosed the existence of "38 bankers boxes" of documents at attorney Greg Hanley's office. But the Trustee's responses also said that these boxes contained only CNA *accounts receivable records*. In fact, the boxes contained many more types of documents that Plante Moran had requested, documents that the Trustee said, in both his document request response and in his interrogatory answers, *that he did not have*. Because of the Trustee's erroneous and misleading discovery responses, Plante Moran's counsel did not inspect the 36 boxes of documents at Hanley's office, believing them to contain only accounts receivable records.

1. **Undisclosed records of CNA for 2000 and 2001**

Documents regarding the year 2000, which the Trustee had but did not disclose, included: CNA documents about the intercompany reconciliations between CNA and, its subsidiary, CNA Finishing; an internal analysis of CNA's operations for the year; an internal analysis related to unvouchered payables; an internal reconciliation of accounts payables for hides as of October 2000; and final audit work papers.[12]

Documents regarding the year 2001, which the Trustee had but did not disclose,

---

11. (*See* "11/7/02 Email from Reich to Landau" (Docket # 135, Ex. 6, Part 3, App. Ex. to Br.)). The Court should note the following about the number of boxes of documents at Hanley's office. While Douglas Reich's November 7, 2002 email, discussed in Section I–F of this opinion, referred to 37 boxes, and the Trustee's document request response referred to 38 boxes, in fact it appears that there were actually 36 boxes of documents at Hanley's office. The "Hanley Index," discussed in Section I–F of this opinion, confirms this.

12. (*See* "Schedule Prepared by Plante Moran's expert, Rodney Crawford" (Docket # 135, Ex. 19, Part 3, App. Ex. to Br.)).

included: monthly financial statements; adjusting journal entries; voucher registers; details about the physical inventory and certain adjustments made to the physical inventory; accounts payable files; accounts payable agings and voucher registers; bank reconciliations from August 2000 through May 2001; and details of invoices and payments made to various suppliers.[13]

### 2. Undisclosed records of CNA Finishing for 2000 and 2001

The Trustee also possessed undisclosed records regarding CNA's subsidiary, CNA Finishing, for the years 2000 and 2001. The year 2000 records included monthly general ledgers; interim financial statements; and journal vouchers. Documents for the year 2001 included monthly general ledgers; financial statements; journal vouchers; adjusting journal entries; voucher registers; accounts payable records and check registers; accounts payable agings and voucher registers; cash disbursements; physical inventory details as of June 30, 2001; and account reconciliations from cash to inventory.[14]

### 3. The undisclosed documents are relevant.

The Trustee does not now seriously dispute that the undisclosed documents are relevant to this case and to Plante Moran's defense. In support of its motion to dismiss, Plante Moran presented a lengthy and detailed chart prepared by its expert, outlining how these documents are relevant to the issues in this case.[15] The

13. (*See id.*).

14. (*See id.*).

15. (*See* "Schedule Prepared by Plante Moran's expert, Rodney Crawford" (Docket # 135, Ex. 19, Part 3, App. Ex. to Br.)).

Trustee has not disputed this chart or the relevance of the undisclosed documents.

### F. The Trustee and his attorney failed to conduct an adequate investigation of the documents before serving the erroneous and misleading 2003 discovery responses.

The Trustee and his attorney, Stephen Landau, failed to conduct an adequate investigation and document search before responding to Plante Moran's discovery requests. Upon receipt of Plante Moran's document request, Landau contacted the Trustee to ask about the location of any responsive documents.[16] He was instructed to call Douglas Reich, an accountant at Conway MacKenzie who worked with Jeffery Divian, the Trustee's lead accountant.[17] Landau spoke to Reich and also sent him a copy of Plante Moran's document request. In response, on November 7, 2002, Reich sent an email to Landau and copied it to the Trustee. It stated:

> Stephen,
>
> Based upon a review of "Defendant's V Request to Produce," *there are numerous documents which may be responsive.* As discussed, we are in possession of our own Connolly workpapers (1–bankers box) and some documents borrowed from Greg Hanley's offices (1–box). *There are 37 additional boxes at Mr. Hanley's offices which contain various Connolly operating books and records.* We would be happy to meet with you to discuss which documents

16. (*See* Tr. of July 20, 2005 Landau's Dep. at 4 lns. 9–12 (Docket # 135, Tab 9, App. of Trial and Dep. Test. to Br. Supp. Plante & Moran's Mot. to Dismiss and Award Sanctions (hereinafter Part 2, App. of Trial and Dep. Test. to Br.))).

17. (*See id.* at 17 lns. 5–6).

may be responsive to the request and how to orchestrate the process.[18]

Sometime later in November 2002, Landau met with Reich to review the documents at Reich's office.[19] On December 2, 2002, Landau went to the office of Greg Hanley, one of the Trustee's attorneys, to review the CNA documents being stored there.[20]

At Hanley's office, Landau did not speak with Hanley about the extent of the CNA records located at his office. He did not ask Hanley about the current state of the records, whether the records had been organized in any particular manner, or if any specific person on his staff was responsible for maintaining the records.[21] Instead, Landau only had a brief conversation with Hanley and then spoke with Barbara Graham,[22] a paralegal at Hanley's office.[23] Ms. Graham took Landau to the room where the CNA records were being stored.[24] Landau spent only "[b]etween 20 to 30 minutes" looking into far fewer than all, but "definitely more than four" of the 36 bankers boxes.[25] During his review,

Landau saw "stacks of colored vouchers."[26] As a result, he says, he believed that the boxes contained only accounts receivable records. Since it would have taken him many hours to go through all the boxes[27] Landau wanted to speak with the Trustee before doing any further document review.

In his post-trial deposition, Landau testified that before his investigation of the records at Hanley's office, he had been told by either the Trustee or Reich, or both of them, that "[Hanley] had 38 boxes of accounts receivable records."[28] He explained that he "[could] not recall who told [him] but [that] there is no question [that] before [he] got to [ ] Hanley's office ... [he] was told that because [Hanley] was doing collections, ... he only had accounts receivable records."[29] Landau also testified that during his conversation with Barbara Graham, "the only thing" he recalled her saying was "something about accounts receivable."[30] Landau explained that his "recollection is absolutely clear that what

---

**18.** (*See* "11/7/02 Email from Reich to Landau" (Docket # 135, Ex. 6, Part 3, App. Ex. to Br.)).

**19.** (*See* Tr. of July 20, 2005 Landau Dep. at 46 lns. 3–19 (Docket # 143, Tab 10, App. to Trustee's Br. in Opp'n to Plante Moran's Motion to Dismiss and Award Sanctions (hereinafter App. to Trustee's Br. in Opp'n))).

**20.** (*See* Tr. of July 20, 2005 Landau's Dep. at 18 lns. 21–25, 19 lns. 1–6 (Docket # 135, Tab 9, Part 2, App. of Trial and Dep. Test. to Br.)).

**21.** (*See id.* at 14 lns. 21–25, 19 lns. 7–21).

**22.** Landau incorrectly referred to Ms. Graham as "Barbara Chapman" throughout his deposition. (*See id.* at 20, lns. 1–15, 25 lns. 5–19). Counsel for Plante Moran sought clarification from Landau about the paralegal's last name when he noticed that the last name used by Landau was different from the last name contained in the computer entry Landau had relied on to refresh his recollection. The computer entry states: "12/2 conf w/Han-

ley-review files with Barbara Graham...." Landau admitted he made a mistake. (*See* Tr. of July 20, 2005 Landau's Dep. at 56 lns. 9–19 (Docket # 135, Tab 9 of Part 2, App. of Trial and Dep. Test. to Br.)).

**23.** (*See id.* at 19 lns. 22–25, 20 ln. 1).

**24.** (*See id.* at 25 lns. 7–9).

**25.** (*See id.* at 26 lns. 21–22, 27 lns. 14–21).

**26.** (*See* Tr. of July 20, 2005 Landau's Dep. at 39 lns. 3–9 (Docket # 143, Tab 10, App. to Trustee's Br. in Opp'n)).

**27.** (*See* Tr. of July 20, 2005 Landau's Dep. at 28 lns. 5–11 (Docket # 135, Tab 9, Part 2, App. of Trial and Dep. Test. to Br.)).

**28.** (*See id.* at 23 lns. 6–24, 24 lns. 24–25).

**29.** (*See id.* at 24 lns. 18–22).

**30.** (*See id.* at 25 lns. 7–15).

[Graham] had done was confirm what [he] had been told by either Reich or Shapiro or both of them, [that Hanley's office] had accounts receivable records because they were collecting accounts receivable."[31] Several times during his deposition, however, Landau acknowledged that no one—not the Trustee, Reich, Hanley, or Barbara Graham—told him that the CNA records at Hanley's office *only* consisted of accounts receivable documents.[32]

After his limited review of the CNA documents at Hanley's office, Landau spoke with the Trustee about having a paralegal go through all of the bankers boxes to verify the contents of each box. The Trustee *denied* Landau's request. The Trustee did this, he says, because to his "knowledge the only documents at Mr. Hanley's office were receivable records and [he] wasn't going to have the estate incur the time and expense of [having someone] go[ ] through the[ ] documents."[33]

Although both Landau and the Trustee apparently believed that the boxes of CNA documents at Hanley's office contained only accounts receivable records, they had information and documents indicating otherwise. First, Reich's November 7, 2002 email, quoted above, had informed both of them that the 36 boxes of CNA records at Hanley's office contained a broad array of documents—"various operating books and records"—instead of just accounts receivables files. There is nothing in the record to indicate that further discussions took place between either Landau or the Trustee on the one hand and Reich on the other hand, about what types of CNA records were in the 36 boxes at Hanley's office.

Second, the 36 bankers boxes at Hanley's office contained "marker notations" on them, which had been placed on the boxes when the documents were placed in them and removed from the CNA facility in 2001.[34] These "marker notations" were used by Jeffery Divian and his staff to specify what types of records were in a particular box. For instance, if the box contained accounts payable records, an "A/P" designation would have been noted; or if the files consisted of the chief financial officer's files, the designation "CFO files" was used.[35] Landau admitted that he did not read *any* of the labels or notations that were on the boxes when he looked at them at Hanley's office.[36] If he had read the labels, he would have seen immediately that the boxes contained far more than just accounts receivable records. Instead of looking at the labels on the boxes, Landau testified that he only looked *inside* a few of the boxes.[37]

Third, Landau admits that he *did not read any* of the "stacks of colored vouchers" that were in the boxes he looked at during his review at Hanley's office.[38] Since we now know that at least five of the

---

31. (*See id.* at 25 lns. 23–25, 26 lns. 1–2).

32. (*See id.* at 14 lns. 16–20 (Hanley), 26 lns. 8–12 (Graham), 54 lns. 7–11 (Reich), and 59 lns. 1–3 (Trustee)).

33. (*See* Tr. of August 5, 2005 Trustee's Dep. at 58 lns. 3–12 (Docket # 143, Tab 10, App. to Trustee's Br. in Opp'n)).

34. (*See* Tr. of August 5, 2005 Divian's Dep. at 7 lns. 23–24 (Docket # 135, Tab 7, Part 2, App. of Trial and Dep. Test. to Br.)).

35. (*See id.* at 7 ln. 25, 8 lns. 1–9).

36. (*See* Tr. of July 20, 2005 Landau's Dep. at 35 lns. 2–18 (Docket # 143, Tab 10, App. to Trustee's Br. in Opp'n)).

37. (*See id.*).

38. (*See id.* at 39 lns. 3–9).

boxes contain documents regarding accounts *payable* for 2001, it is possible that the vouchers Landau saw actually pertained to accounts *payable* and not, as he apparently assumed, to accounts *receivable*.

Fourth, a detailed index spanning six pages, describing the nature and type of CNA documents located in each box at Hanley's office, had been prepared by a member of Hanley's staff sometime between May and September 2002 (the "Hanley Index").[39] The Hanley Index described the contents of all the bankers boxes,[40] and clearly showed that the 36 boxes at Hanley's office contain many relevant documents responsive to Plante Moran's document request. And the Hanley Index made clear that these boxes contained far more than just the "accounts receivable files" referred to in the Trustee's 2003 document request response. Indeed, it was when the Hanley Index came to light, during trial, that the mistrial had to be ordered. By way of example, a part of the Hanley Index provides the following information:

| Box No. | Connolly Box No. | Description |
|---|---|---|
| 273 | | Connolly Vendor Files/Invoices |
| 274 | # 26 | Invoices |
| 275 | | Connolly Employee/Admin files |
| 276 | # 14 | CFO's office files, NBD accounts, Bank One, Wire Transfers |
| 277 | # 20 | CFO's files, Admin. files, Insurance policies |
| 278 | # 6 | Bank Accounts Line of Credit Bank One |
| 279 | # 5 | Financial statements, journal voucher, liabilities, equities |
| 280 | # 15 | CFO's office files |
| 281 | # 16 | CFO's office files |
| 282 | # 18 | Leatherworks dispute concessions |
| 283 | # 10 | Trade receivables & miscellaneous files 2001 |
| 284 | # 11 | Accounts payable finishing 2001 A–Z |
| 285 | # 7 | A/P 2001 |
| 286 | # 9 | A/P 2001 |
| 287 | # 24 | A/P 2001 |
| 288 | # 21 | CFO's office files [41] |

If Landau had interviewed Hanley or his staff to any meaningful extent, and asked them the most basic questions about the CNA records, especially in light of Reich's email, Landau would have learned of and obtained the Hanley Index. Yet Landau acknowledges that he did not have any "substantive conversation" with Hanley, and says he never asked anyone about a document index because "it never crossed his mind" to ask about one, and nothing occurred that "would[ ] [have] prompted him to do so."[42]

The Trustee himself would have been made aware of the preparation of the Hanley Index if he had read the details of Hanley's first fee application, filed in the CNA bankruptcy case on October 11, 2002.[43] That fee application covered services provided by Hanley's firm from February 1, 2002 through September 30, 2002. It contained several detailed time entries for "Beth" about her review of boxed documents and the preparation of an index.[44]

Fifth and finally, beginning in late 2001, Jeffery Divian, the Trustee's accountant, had personally helped, with some direction from the Trustee, in the compilation, removal, and preservation of CNA records from CNA's Highland Park facility.[45]

**39.** (*See* Hanley's First Interim Fee Application (Docket # 135, Ex. 2, Part 3, App. Ex. to Br.)).

**40.** (*See* Hanley Index (Docket # 135, Ex. 1, Part 3, App. Ex. to Br.)).

**41.** (*See id.*).

**42.** (*See* Tr. of July 20, 2005 Landau's Dep. at 19 lns. 18–21, at 27 lns. 24–25, 28 lns. 1–4 (Docket # 135, Tab 9, Part 2, App. of Trial and Dep. Test. to Br.)).

**43.** (*See* Hanley's First Interim Fee Application (Docket # 135, Ex. 2, Part 3, App. Ex. to Br.)).

**44.** (*See id.*).

**45.** (*See* Tr. of August 5, 2005 Divian's Dep. at 7 lns. 5–22 (Docket # 135, Tab 7, Part 2, App. of Trial and Dep. Test. to Br.)).

Through this experience, Divian acquired an intimate knowledge about the CNA records retained by the Trustee. Yet Landau could not recall interviewing Divian about existing CNA records before responding to Plante Moran's discovery requests.[46] Landau testified that it was "likely" that he spoke with Divian about the CNA records sometime after the Trustee's 2003 discovery responses were served and before the start of the jury trial.[47] But Landau testified that during their discussion, he did not ask about, nor did Divian tell him about, the CNA records that had been retained or whether there was a document index.[48] He testified that his "only recollection [was] that at some point in time ... [Divian] confirmed ... [that] some records were destroyed." [49]

### G. The Trustee never supplemented and corrected his erroneous 2003 discovery responses, despite actually having the Hanley Index and serving it with a discovery response in another adversary proceeding in 2004, and despite having actual knowledge in 2004 that he had the undisclosed CNA accounting records

Plante Moran contends that the Trustee breached his duty to supplement his discovery responses in this proceeding because he knew, by the end of December 2004, that his discovery 2003 responses in this case were inaccurate. The undisputed facts clearly establish that at least as early as 2004, several months before the trial in this case, the Trustee had actual knowledge of facts which make clear that his 2003 discovery responses were erroneous.

By December 2004, the 36 boxes of documents at Greg Hanley's office were still in the Trustee's possession, but they had been moved to the Iron Mountain storage facility in Livonia, Michigan. The Trustee actually had the Hanley Index of these documents as early as June 10, 2004, and later in 2004 he actually served a copy of the Hanley Index as part of his discovery responses in two *other* adversary proceedings. In these two other cases, the Trustee was represented by his law partner, Tracy M. Clark of Steinberg, Shapiro and Clark.

The first case, filed on September 30, 2003, was a large preference action against Art Leather, Inc., Case No. 03–5070. On June 16, 2004, Art Leather served the Trustee with its "First Request for Admissions, Interrogatories and Request for Production of Documents." [50] The Trustee and his attorney Tracy Clark each participated in preparing the responses to these discovery requests.[51] As part of his responses, served on September 2, 2004, the Trustee disclosed that CNA records in his possession were "being held in storage" and *attached the Hanley Index* as an exhibit.[52] The Hanley Index had been obtained by Clark in an email she received on June 10, 2004, from Tina Coon, a secretary at Hanley's office.[53]

46. (*See* Tr. of July 20, 2005 Landau's Dep. at 15 lns. 4–8 (Docket # 135, Tab 9, Part 2, App. of Trial and Dep. Test. to Br.)).

47. (*See id.* at 15 lns. 14–18).

48. (*See id.* at 16 lns. 3–12).

49. (*See id.* at 15 lns. 19–22 and 16 ln. 1).

50. (*See* Certificate of Service) (Docket # 29 in Adv. Pro. # 03–5070).

51. (*See* Trustee's Response to Request for Admissions, Interrogatories and Document Request at 20 (Docket # 135, Ex. 11, Part 3, App. Ex. to Br.)).

52. (*See id.* at 23, 27–36).

53. (*See* Email of Christine A. Coon (Docket # 135, Ex. 10, Part 3, App. Ex. to Br.)).

Despite this discovery response, the Trustee denies knowing about the existence of the Hanley Index or Ms. Coon's email before the jury trial in this case.[54] The Trustee contends that he first learned about these things after the mistrial, in July 2005.[55] His law partner, Ms. Clark, however, testified in her deposition that she thought she "probably" discussed Ms. Coon's email with the Trustee and that he knew about the Hanley Index as early as June 10, 2004.[56] But she also testified that she never saw the Trustee read the Hanley Index and that she never discussed with him the specific contents of the boxes identified in the Hanley Index.[57]

The second case, filed on December 3, 2003, was a preference action against Pearl Leather Finishers, Inc., Case No. 03–5316. In that case, Ms. Clark signed and served a supplemental discovery response dated December 30, 2004.[58] In this response, the Trustee stated that it was necessary to supplement "his initial disclosures and responses to [d]efendant's request for production of documents to include certain documents that were located at the Iron Mountain storage facility that were recently discovered by [the Trustee.]"[59] The Trustee's supplement said that although "[d]efendant was provided complete access to the documents stored at the Iron Mountain facility during the discovery period[,]" particular accounting records "may not

have been uncovered" by the defendant's attorneys.[60] The supplement described these newly discovered paper documents in some detail, and *none of them were account receivable documents*. Rather, they were various *other* types of CNA accounting records for the years 2000 and 2001.[61]

During his post-trial deposition in this case, the Trustee testified that he "got more fully involved" in the Art Leather and Pearl Leather cases in "September or October" 2004.[62] He admitted that he knew, *by the end of 2004,* that he had CNA accounting records, *other than accounts receivable records,* in storage at Iron Mountain.[63] The Trustee testified that he failed to disclose to Plante Moran the extent of these documents in storage for these reasons:

> First of all, I had assumed at that point that you had seen everything that was available, and secondly, that whatever records … were retained simply did [not] pertain to the particular dates that were relevant to the alleged malpractice. Never made the connection that documents at Iron Mountain had anything to do with the malpractice, otherwise I can assure you they would have been provided.[64]

> . . . .

---

**54.** (*See* Tr. of August 5, 2005 Trustee's Dep. at 44 lns. 8–25, 45 lns. 1–5 (Docket # 143, Tab 6, App. to Trustee's Br. in Opp'n)).

**55.** (*See id.*).

**56.** (*See* Tr. of June 24, 2005 Clark Dep. at 35 lns. 13–15 (Docket # 135, Ex. 6, Part 3, App. Ex. to Br.)).

**57.** (*See id.* at 36 lns. 13–22).

**58.** (*See* Trustee's Supplemental Response (Docket # 135, Ex. 14, Part 3, App. Ex. to Br.)).

**59.** (*See id.*).

**60.** (*See id.*).

**61.** (*See id.* at 1–3).

**62.** (*See* Tr. of August 5, 2005 Trustee's Dep. at 62 lns 14–21 (Docket # 135, Tab 11, Part 2, App. of Trial and Dep. Test. to Br.)).

**63.** (*See id.* at 81 lns. 10–13)

**64.** (*See id.* at 81 lns. 14–25).

I assumed that either you had seen everything or that you had been provided access to everything.[65]

These assumptions by the Trustee were *not* correct. And although the Trustee appears to have made these assumptions in good faith, there was no good basis for them.

## H. The Trustee and his attorney repeated their erroneous discovery responses in responding to Plante Moran's first motion to dismiss

One result of the Trustee's erroneous 2003 discovery responses, and the Trustee's failure to correct them, was that the parties filed several motions that ultimately proved to have been unnecessary. The first of these was Plante Moran's April 25, 2003 motion seeking dismissal of the Trustee's complaint, as a sanction for the Trustee's decision to discard documents. In that dismissal motion, Plante Moran alleged that "the Trustee destroyed virtually all of the accounting records of [CNA] for the year 2000 after the Trustee knew it had a potential claim against Plante Moran."[66] Plante Moran cited the 2003 deposition testimony of the Trustee, admitting that he authorized the destruction of CNA documents.[67]

Plante Moran argued that it had been prejudiced since "[t]he Trustee destroyed the very documents that a fact finder, or an expert, would have to review to make a determination whether Plante Moran's opinion that the financial statements fairly presented the financial condition of Connolly was correct."[68] Plante Moran explained:

This prejudice can be illustrated by reviewing two of the specific claims in the case. The Complaint lists a number of issues with respect to the audit. Those issues came directly from a September 27, 2001 letter written by John Lycos, the last CFO of Connolly, to Dan Swanson, a lawyer for Connolly. The Trustee has deposed John Lycos and he testified with respect to these issues.

The largest issue by dollar value involves the inventory. Connolly conducted a physical count of the inventory as of December 31, 2000. *That physical inventory has been destroyed.* John Lycos was hired as the CFO in April of 2001. He determined that there was a potential problem with the inventory in 2001 and he had Connolly conduct a physical inventory as of June 30, 2001. *That inventory was destroyed.* [Mr.] Lycos testified that he performed an analysis of the inventory differences which formed the basis for his opinion that there was a problem with the inventory as of December 30, 2000. *That analysis was destroyed.* Thus, all the original documents related to this claim and the analysis that [Mr.] Lycos relied on to form his opinion have been destroyed by the Trustee.

The second biggest issue in the Complaint by dollar amount involves unvouchered payables. This issue relates to materials in transit. Connolly manufactured leather seats for the automotive industry. The principal raw material was animal hides shipped from Argentina. Connolly had a software system that tracked unvouchered payables. *The records from that system were de-*

---

**65.** (*See* Tr. of August 5, 2005 Trustee's Dep. at 84 lns. 22–25, 85 ln. 1 (Docket # 143, Ex. 6, App. to Trustee's Br. in Opp'n)).

**66.** (*See* Plante Moran's "First Br. in Supp. of Mot. to Dismiss" (Docket # 27 at 2.)).

**67.** (*See id.* at 4, quoting April 15, 2005 Tr. of Mark Shapiro at 39 (Docket # 27.)).

**68.** (*See id.* at 4).

*stroyed.* [Mr.] Lycos testified that his opinion that the unvouchered payable number at December 30, 2000 was incorrect was based on an analysis he performed of unvouchered payables. *That analysis was destroyed.* Once again, the Trustee not only destroyed the underlying documents which form the basis of the claim, but also destroyed the analysis on which [Mr.] Lycos relies in forming his opinion with regard to the unvouchered payables.[69]

In response to Plante Moran's dismissal motion,[70] the Trustee represented that he disposed of records that were unnecessary to the administration of the debtor's estate. His disposal of records was triggered, he said, by his need to return leased CNA premises to the landlord near the end of December 2001.[71] The Trustee stated that "there were a tremendous amount of records" and he realized that "it was physically impossible to try and retain everything."[72] *Id.* The Trustee explained that he relied on the assistance he received from Bill Canney of Bank One, the Debtor's major secured creditor, and Jeff Divian, the Trustee's accountant, to decide which documents to retain and store.[73]

The Trustee further explained that a document was considered to be necessary and was retained if it pertained to the claims of Bank One, claims for accounts receivable, the filing of tax returns, or the administration of the estate.[74] The Trustee represented that he "relied in large part" on his accountants (Divian and Conway MacKenzie) to "identify those documents they felt were necessary to administer the estate[.]"[75]

In addition, the Trustee argued that the destroyed records "are not relevant to the claims or defenses in this litigation."[76] And Trustee and his counsel repeated the error of their 2003 document request response, by stating again that the boxes of documents at Greg Hanley's office *were limited to accounts receivable records.* He stated that "literally thousands of pages of documents, filling 13 storage boxes," were produced and that "other counsel retained by the Trustee has possession of 39 banker's boxes of records *relating to accounts receivable.* These records have been made available to defendant for inspection and copying."[77]

After hearing oral argument on Plante Moran's motion on July 22, 2003, the Court, through visiting Judge Perlman,[78] denied Plante Moran's motion, reasoning that:

69. (*See id.* at 4–5) (emphasis added) (citations omitted to the deposition transcript of Mr. Lycos).

70. (*See* Trustee's Objections to Plante Moran's First Dismissal Motion (Docket # 30)).

71. (*See* Trustee's Br. in Opp'n. to Plante Moran's First Dismissal Motion at 8, citing Tr. of Trustee's April 15, 2003 Dep. (attached as Ex. 8) (Docket # 31)).

72. (*See id.* at 8 quoting Tr. of Trustee's April 15, 2003 Dep. at 27 lns. 1–3 (Docket # 31)).

73. (*See id.* at 8 quoting Tr. of Trustee's April 15, 2003 Dep. at 21 lns. 16–19 (Docket # 31)).

74. (*See id.* at 8 quoting Tr. of Trustee's April 15, 2003 Dep. at 21 lns. 10–14, 22 lns. 17–21 (Docket # 31)).

75. (*See id.* at 9 quoting Tr. of Trustee's April 15, 2003 Dep. at 26 lns. 8–11 (Docket # 31)).

76. (*See id.* at 2).

77. (*See* Trustee's Br. in Opp'n to Plante Moran's First Dismissal Motion at 3 and n. 1 (emphasis added) (Docket # 31)).

78. Visiting judge Burton M. Perlman, who was assigned to this adversary proceeding at the time. The case was reassigned to the undersigned judge on September 16, 2003 (Docket # 37).

[i]n order to grant a motion based on spoilation [of evidence], I have to conclude that the destruction of records was a deliberate effort by the Trustee to bre[a]ch, and on what you submitted to me, I can't reach that conclusion.

. . . .

[T]he remedies that you mention aren't entirely relevant. If you are prejudiced by the destruction of these documents, this will become apparent in the course of trial, and the Court will take appropriat[e] action, such as holding it against the Trustee, should it become apparent as to what's presented to you. But it seems to me that the question here is about the remedy, and it should be left for the trial.[79]

## I. The Trustee and his attorney repeated their erroneous discovery responses in responding to Plante Moran's 2004 motion in limine

A second motion that ultimately proved to be unnecessary was Plante Moran's "Motion in Limine to Preclude Introduction of Evidence," filed June 18, 2004.[80] In that motion, Plante Moran argued that it had been prejudiced by the Trustee's destruction of accounting records relevant to the Trustee's claims relating to (1) unvouchered payables; (2) inventory adjustments; and (3) damages. Plante Moran requested that the Trustee be precluded from introducing any evidence in support of these claims.

In opposing Plante Moran's motion,[81] the Trustee and his counsel again repeated

their earlier, erroneous representation that "other counsel retained by the Trustee has possession of 39 banker's boxes of records *relating to accounts receivable.* These records have been made available to [Plante Moran] for inspection and copying." [82]

On August 19, 2004, the Court held a hearing and denied Plante Moran's motion in limine, because the record then was insufficient to enable the Court to find that the Trustee intentionally destroyed evidence to prejudice Plante Moran, or that the Trustee knew or should have known about the relevance of the documents when he destroyed them. The Court noted that its ruling did not prevent Plante Moran from raising the spoilation issues again at trial.

## J. The Trustee and his attorney reinforced their erroneous discovery responses in filing the Trustee's 2005 motion in limine

A third unnecessary motion was the Trustee's motion in limine, filed on March 28, 2005, shortly before trial. Like the two other motions described above, that motion was premised on the Trustee's destruction of documents that in fact had not been destroyed. Among other things, that motion sought to preclude Plante Moran "from making any reference [at trial] to [Trustee's] alleged spoilation of evidence." [83] Plante Moran opposed the motion, and after a hearing on May 4, 2005, the Court denied the motion.

---

79. (*See* Tr. of "Hearing on Motion by Defendant Plante & Moran, LLP to Dismiss Case and For Sanctions," at 10 lns. 3–9 (Docket # 38)).

80. (Docket # 46).

81. (*See* Trustee's Br. in Opp'n to Plante Moran's Mot. in Limine (Docket # 48)).

82. (*See id.* at 4 n. 2 (Docket # 48) (emphasis added)).

83. (*See* Trustee's Mot. in Limine at ¶ 12 (Docket # 63)).

**K. The Trustee and his attorney reinforced and repeated their erroneous discovery responses at trial, in the Trustee's opening statement and the Trustee's trial testimony**

The jury trial began on May 17, 2005. The opening statement by the Trustee's attorney Landau included a brief explanation about the Trustee's decision to retain CNA records that he needed, based on the assistance and advice of his consultants, and to dispose of CNA records he did not need in order to minimize the expenses incurred by the estate.

In his opening statement, counsel for Plante Moran told the jury that the audit services at issue involved the year ending December 31, 2000 and that CNA's accounting records for that year were relevant. He pointed out that the Trustee "threw out virtually all of the accounting records of [CNA]" at the end of 2001 before he decided to authorize this lawsuit against Plante Moran. He described the accounting records thrown out by the Trustee as being inventory documents, accounts payable files, unvouchered payables, and bank statements for the year 2000. The result, he argued, was that "most of the relevant evidence about CNA no longer exists."

After opening statements, the Trustee took the stand as his own first witness. He testified that there were "hundreds of boxes" of records at CNA's facility when he was appointed as trustee.[84] Due to an auction of CNA's assets and the need to vacate CNA's leased facility, he decided to

retain those records he determined were necessary, based on advice he received from his consultants, to remove those records from CNA's facility, and to dispose of the remaining records.[85] Those remaining records were disposed of "prior to December 31, 2001."[86] The Trustee explained that it would have been physically impossible and cost prohibitive to the estate to store all of the CNA records.[87]

During cross-examination, the Trustee said that he did not know what records were destroyed. When asked about his 2003 answers to Plante Moran's interrogatories, the Trustee testified that he did not "personally participate in the preparation of responses to discovery." He also testified that he did not know if the categories of documents that Plante Moran asked about in its interrogatories were destroyed. He testified that he "did not know what was there beyond what [he] took with [him]."

When asked whether he knew if inventory records for the year 2000 were kept or whether any existed, the Trustee answered "not that I know of." Excluding accounts receivable records, Plante Moran then asked the Trustee "if he knew if there were any original accounting records for the year 2000 that were *not* thrown away?" (italics added). The Trustee initially responded "certainly, the general ledger papers." When Plante Moran's counsel sought clarification on this, the Trustee corrected himself: "The general ledger for 2000? ... No, not for 2000 and I do not know of any others."

---

**84.** (*See* Tr. of May 17, 2005 Trial Test. at 194 lns. 1–6 (Docket # 135, Tab 1, Part 2, App. of Trial and Dep. Test.)).

**85.** (*See* Tr. of May 17, 2005 Trial Test. at 192 lns. 22–25, 193–194 (Docket # 143, Tab 5, App. to Trustee's Br. in Opp'n)).

**86.** (*See id.* at 195 lns. 12–13).

**87.** (*See id.* at 193 lns. 19–22).

### L. The truth comes out later during the trial

But a substantial amount of undisclosed CNA accounting records did exist, and this came to light beginning on the seventh day of the jury trial, on May 31, 2005. On that day, the Trustee's accountant Jeffery Divian testified about the CNA records in the Trustee's possession. On direct examination by Landau, Divian testified that during his 2001 walk-through of CNA's Highland Park facility with the Trustee, they discussed the types of records that should and should not be retained by the Trustee.[88] Divian testified that they elected to retain the following records: accounts receivable, *payable records,* bank records, records of the chief financial officer, insurance documents, and certain payroll records.[89] On cross-examination, Plante Moran focused on Divian's testimony that some of CNA's *accounts payable* records were retained by the Trustee. Divian testified that paper copies of accounts payable records had indeed been kept, and said that he would have to look at "a list" to be certain about the extent of the accounts payable records that existed. Divian testified that payable files for 2000 and 2001 could be located at the Iron Mountain records storage facility in Livonia, Michigan. The jury was then excused, and counsel for Plante Moran immediately moved for a mistrial and dismissal of the case.

The Court then permitted further questioning of Divian, outside the presence of the jury. Divian then testified that he managed the process of removing and retaining records from CNA's Highland Park facility. He explained that the boxes of documents to be retained were filled by individuals other than himself, based on his direction on the type of CNA records he wanted to keep. He testified that the boxes were each identified by a label that described their contents. Divian testified that he took some boxes of CNA records to his office, and that after a couple of months they were then taken to Greg Hanley's office, and that a list describing the retained records had been created and maintained by Hanley's office. He explained that the retained records now were at the Iron Mountain storage facility in Livonia.

After this questioning, the Court recessed the trial to permit the parties to obtain a copy of the document list Divian testified about, and to conduct an on-site review of the accounting records stored at Iron Mountain. Shortly thereafter, the Trustee informed the Court that Hanley did have the list referred to by Divian, and a copy of it was given to Landau and to Plante Moran's counsel. This list was the Hanley Index described in Part I–F of this opinion, which, we now know, the Trustee had in his possession beginning at least a year earlier, on June 10, 2004.[90]

### M. The mistrial and Plante Moran's current motion to dismiss

The Hanley Index and the parties' inspection of the documents at Iron Mountain each confirmed that the Trustee had possession all along of many boxes of relevant, undisclosed documents that Plante Moran had requested in its 2002 document request.[91] On June 3, 2005, the Court ordered a mistrial and discharged the jury. The Court held a scheduling confer-

---

88. (*See* Trial Tr. of May 31, 2005 at 163 lns. 12–20 (Docket # 135, Tab 3, Part 2, App. of Trial and Dep. Test.)).

89. (*See id.*).

90. (*See* Part I–G of this opinion.).

91. *See* discussion in Sections I–F through I–G of this opinion.

ence, and permitted the parties to engage in discovery regarding Plante Moran's oral dismissal motion.[92] On August 17, 2005 Plante Moran filed a written motion seeking dismissal of this proceeding with prejudice and monetary sanctions.[93] The parties briefed that motion at length, submitted numerous exhibits, and argued the motion at a hearing. The Court then took the motion under advisement.

## II. Jurisdiction

This Court has subject matter jurisdiction under 28 U.S.C. §§ 1334(b), 157(a) and 157(b)(1), and Local Rule 83.50(a) (E.D.Mich.). The parties agree that this is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (E) and/or (O). To the extent this is not a core proceeding, the parties have consented to this Court entering final judgment under 28 U.S.C. § 157(c)(2).[94]

## III. Discussion

Plante Moran seeks sanctions for discovery misconduct committed by the Trustee and his counsel, under the Court's "inherent power" and under Fed.R.Bank.P. 7026 and 7037, which apply Fed.R.Civ.P. 26 and 37 in adversary proceedings.

### A. Discovery obligations under Civil Rule 26

Unless a party is unrepresented, an attorney must sign all discovery responses. Fed.R.Civ.P. 26(g)(2). The attorney's signature certifies "that to the best of the signer's knowledge, information, and belief, formed after a reasonable inquiry," the response is "(A) consistent with these rules ...; (B) not interposed for any improper purpose ...; and (C) not unreason-

able or unduly burdensome[.]" *Id.* An attorney possesses an "affirmative duty to engage in pretrial discovery in a responsible manner that is consistent with the spirit and purposes of Rules 26 through 37." Advisory Committee Notes to 1982 Amendment to Fed. Civ. P. 26(g). In addition, Rule 26(g) "provides a deterrent to both excessive discovery and evasion by imposing a certification requirement that obliges each attorney to stop and think about the legitimacy" of a response to interrogatories or requests to produce documents. *Id.*

After a party responds to a discovery request, the party

> is under a duty to supplement or correct the ... response to include information thereafter acquired if ... the party learns that the response is in some material respect incomplete or incorrect and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing.

Fed.R.Civ.P. 26(e)(2). *See also Abrahamsen v. Trans–State Express, Inc.,* 92 F.3d 425, 428 (6th Cir.1996)(a party is under a "continuing obligation to supplement discovery" to disclose information or documents he becomes aware of after his earlier discovery responses).

### B. The sanction of dismissal under Civil Rules 37(c)(1) and 37(b)(2)(C) for discovery violations

█ Fed.R.Civ.P. 37 authorizes the court to award sanctions for discovery misconduct. The trial court has broad discretion in selecting a sanction that is proportionate to the particular discovery vio-

**92.** (*See* "Stipulated Order Adopting Practice Discovery Plan" (Docket # 118)).

**93.** (Docket # 135).

**94.** (*See* Final Pretrial Order, filed April 4, 2005 at 1–2 (Docket # 68)).

lations committed by a party. *Bank One of Cleveland, N.A. v. Abbe,* 916 F.2d 1067, 1073 (6th Cir.1990)(recognizing the "well-established" abuse of discretion standard applies to the review of a district court's decision to dismiss a case under Fed. R.Civ.P. 37(b)(2)(C)) (quoting *Regional Refuse Systems, Inc., v. Inland Reclamation Co.,* 842 F.2d 150, 153–54 (6th Cir. 1988)). *See also National Hockey League v. Metropolitan Hockey Club,* 427 U.S. 639, 642, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976)(stating that it is not whether an appellate court "would as an original matter have dismissed the action; it is whether the [lower court] abused its discretion in so doing.")

■ A party's failure to comply with Rule 26(e)(2) may give rise to sanctions under Rule 37(c)(1). The first sanction listed in that rule is exclusion of evidence, but the rule permits other appropriate sanctions:

> A party that *without substantial justification* fails to disclose information required by Rule 26(a) . . . or to amend a prior response to discovery as required by Rule 26(e)(2), is not, *unless such failure is harmless,* permitted to use as evidence at a trial . . . information not so disclosed. *In addition to or in lieu of* this sanction, the court, on motion and after affording an opportunity to be heard, may impose other appropriate sanctions. In addition to requiring payment of reasonable expenses, including attorney's fees, caused by the failure, *these sanctions may include any of the actions authorized under Rule 37(b)(2)(A), (B), and (C)* and may include informing the jury of the failure to make the disclosure.

Fed.R.Civ.P. 37(c)(1)(italicized emphasis added). By incorporating the sanctions allowed under Rule 37(b)(2)(C), which in-

clude dismissal of an action, Rule 37(c)(1) authorizes the sanction of dismissal.

■ Dismissal, of course, is a severe sanction, to be used with great caution. It may be "imposed only if the court concludes that a party's failure to cooperate in discovery is due to willfulness, bad faith, or fault." *Regional Refuse Systems, Inc. v. Inland Reclamation Company,* 842 F.2d 150, 153–54 (6th Cir.1988)(citing *Patton v. Aerojet Ordnance Co.,* 765 F.2d 604, 607 (6th Cir.1985)). This sanction is available in appropriate cases, however, because it "accomplishes the dual purpose of punishing the offending party and deterring similar litigants from such misconduct in the future." *Bass v. Jostens, Inc.,* 71 F.3d 237, 241 (6th Cir.1995)(citing *National Hockey League v. Metropolitan Hockey Club, Inc.,* 427 U.S. 639, 646, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976)).

■ In the Sixth Circuit, when deciding whether to impose the sanction of dismissal with prejudice under Rule 37(b)(2)(C), the court must consider the following four factors:

(1) whether the party's failure to comply with the discovery rules is due to willfulness, bad faith, or fault;

(2) whether the adversary was prejudiced by the party's noncompliance;

(3) whether the party was warned that failure to comply could lead to dismissal; and

(4) whether less drastic sanctions were imposed or considered before dismissal was ordered.

*Bass v. Jostens, Inc.,* 71 F.3d 237, 241 (6th Cir.1995)(citing *Bank One of Cleveland, N.A. v. Abbe,* 916 F.2d 1067, 1073 (6th Cir.1990)). These are not all requirements that must be met, but rather are factors to be considered. "[N]o one factor is dispositive," *see United States v. Reyes,* 307 F.3d 451, 458 (6th Cir.2002), except that as not-

ed above, Sixth Circuit cases hold that the sanction of dismissal may not be used in the absence of the first factor—"willfulness, bad faith, or fault."

### C. Consideration of the relevant factors in this case

As discussed in more detail below, the Trustee and his attorney clearly violated their discovery obligations under Civil Rule 26. The Court will now apply the relevant factors discussed above, to determine the appropriate sanction(s).

#### 1. Level of culpability—willfulness, bad faith, or fault

■■ The noncomplying party—here, the Trustee—bears the "burden of showing that his failure to comply was due to inability and not to willfulness, bad faith, or fault."[95] *United States v. Reyes,* 307 F.3d 451, 458 (6th Cir.2002)(citing *Regional Refuse Sys.,* 842 F.2d 150, 154 (6th Cir.1988)). "It is presumed that dismissal is not an abuse of discretion if the party has the ability to comply but does not." *Id. See also Societe Internationale v. Rogers,* 357 U.S. 197, 211, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (1958)(a litigant could avoid the dismissal of its complaint under Rule 37(b)(2) if the failure to comply with discovery "was due to inability fostered neither by its own conduct nor by circumstances within its control.")

Of the three levels of culpability in this context—"willfulness, bad faith, or fault"—the Sixth Circuit has defined only willfulness. In *Bass v. Jostens, Inc.,* 71 F.3d 237, 241 (6th Cir.1995), the Sixth Circuit held that "a willful violation ... is any conscious or intentional failure to comply."

(citing *Brookdale Mill v. Rowley,* 218 F.2d 728, 729 (6th Cir.1954)).

Although the Sixth Circuit has not yet defined what the "fault" culpability concept means in this context, other appellate courts have done so. In *Cine Forty–Second Street Theatre Corp. v. Allied Artists Pictures Corp.,* 602 F.2d 1062 (2nd Cir. 1979), the Second Circuit held that "fault" includes gross negligence. The *Cine* court explained that its view:

> advances the basic purposes of Rule 37, while respecting the demands of due process. The principal objective of the general deterrent policy of *National Hockey* is strict adherence to the 'responsibilities counsel owe to the [c]ourt and to their opponents,' 427 U.S. at 640, 96 S.Ct. at 2780. Negligent, no less than intentional, wrongs are fit subjects for general deterrence, ... And gross professional incompetence no less than deliberate tactical intransigence may be responsible for the interminable delays and costs that plague modern complex lawsuits.

> Considerations of fair play may dictate that courts eschew the harshest sanctions provided by Rule 37 where failure to comply is due to a mere oversight of counsel amounting to no more than simple negligence. But where gross professional negligence has been found[,] that is, where counsel clearly should have understood his duty to the court[,] the full range of sanctions may be marshalled.

*Id.* at 1067 (emphasis added); *see also Bratka v. Anheuser–Busch Co. Inc.,* 164 F.R.D. 448, 460 (S.D.Ohio 1995)(adopting

**95.** This requirement of "willfulness, bad faith, or fault," which must exist before the Court may invoke the sanction of dismissal, logically encompasses (and exceeds) the requirement in Civil Rule 37(c)(1) that in order to be sanctionable, the offending party's discovery violation(s) must have been "without substantial justification." *See* Fed.R.Civ.P. 37(c)(1), quoted above in Part III–B of this opinion.

gross negligence standard articulated by *Cine*).

Similarly, the Seventh Circuit in *Marrocco v. General Motors Corp.*, 966 F.2d 220, 224 (7th Cir.1992), affirmed a district court's directed verdict as a sanction for a party's discovery misconduct. The discovery misconduct involved in *Marrocco* was characterized as "extraordinarily poor judgment," "gross negligence," and "a flagrant disregard of [the party's] duty, ... to preserve and monitor the condition of evidence which could be pivotal in a law suit." The Court held that gross negligence falls within the category of "fault" and can therefore justify a claim-dispositive sanction. The *Marrocco* court explained that "[f]ault does not speak to the noncomplying party's disposition at all, but rather only describes the reasonableness of the conduct-or lack thereof-which eventually culminated in the violation." *Id.*

More recently, in *Long v. Steepro*, 213 F.3d 983, 987 (7th Cir.2000), the Seventh Circuit elaborated on this "fault" concept by explaining that:

> Although wilfulness and bad faith are associated with conduct that is intentional or reckless, the same is not true for 'fault.'
>
> Fault [ ] is not a catch-all for any minor blunder that a litigant or his counsel might make. Fault, in this context, suggests objectively unreasonable behavior; it does not include conduct ... classif[ied] as a mere mistake or slight error in judgment.

*Id.*

In this case, the evidence does not show either the Trustee or his attorney to be guilty of "willfulness" or "bad faith" in his failure to comply with his discovery obligations. The Court is satisfied that neither the Trustee nor his attorney intentionally withheld documents or intentionally gave false discovery responses or false testimony. And while the Court has not had any experience with the Trustee's attorney, Stephen Landau, other than in this case, the Court has had a good deal of experience with the Trustee, Mark Shapiro, in other cases, and considers him to be a person of great integrity. Mr. Shapiro also is an extremely competent and diligent attorney, and a very effective and efficient bankruptcy trustee (which makes what happened in this case all the more surprising).

But the Trustee has not met his "burden of showing that his failure to comply was due to inability and not to willfulness, bad faith, or fault." *United States v. Reyes*, 307 F.3d at 458. To the contrary, the undisputed facts demonstrate that the Trustee's discovery violations *were* due to "fault," in the form of gross negligence, on the part of the Trustee's attorney, which is chargeable to the Trustee, and on the part of the Trustee himself. And the Trustee obviously had the *ability* all along to disclose and produce the undisclosed documents to Plante Moran, and to give accurate, rather than incorrect and misleading, discovery responses.

Gross negligence may be is defined in various ways, including "[a] lack of slight diligence or care;" or "[a] conscious, voluntary act or omission in reckless disregard of a legal duty." *See Black's Law Dictionary* 1057 (7th ed.1999). "Reckless disregard," in turn, is "[c]haracterized by the creation of a substantial and unjustifiable risk of harm to others, and by a conscious (and sometimes deliberate) disregard for or indifference to that risk." *See id.* at 1276; *see also Roberts v. Erhard (In re Roberts)*, 331 B.R. 876, 884 (9th Cir. BSP 2005), *aff'd.*, 2007 WL 2089041 (9th Cir. 2007).

The facts recounted in Section I of this opinion show that both the Trustee and his

attorney were grossly negligent in, to borrow words from another case, their "lack of diligence in planning and executing an effective search for the relevant documents" requested by Plante Moran in discovery. And their conduct shows "a lack of respect for the seriousness of [their] duties under the Federal Rules of Civil Procedure and the importance of full and fair discovery under the Rules." *Bratka v. Anheuser–Busch Co.*, 164 F.R.D. at 460.

■ With respect to the Trustee's attorney, Stephen Landau, the undisputed facts show that:

1. Landau's investigation and document search, conducted before he signed the Trustee's 2003 response to Plante Moran's document request, produced documents, and signed the Trustee's 2003 interrogatory answers, was grossly inadequate.

2. Landau knew, from the November 7, 2002, e-mail of Douglas Reich, who worked with Jeffrey Divian, the Trustee's accountant, that there were *"37 additional boxes at Mr. Hanley's offices which contain various Connolly operating books and records"* (emphasis added) and, thus, that these boxes contained more than just CNA accounts receivable records.

3. Although Landau talked to Douglas Reich, he did not interview Jeffrey Divian, who had played a leading role in the retention and removal of documents from the CNA facility in late 2001, and who thereby had an intimate knowledge of what was in the many boxes of documents at Hanley's office. (Indeed, it was Divian's testimony at trial, on cross examination by Plante Moran, that

led to the discovery of the 36 boxes of undisclosed documents at issue.) [96]

4. When Landau went to attorney Greg Hanley's office in the fall of 2003, where the 36 boxes of documents were located, he did not do any of the following:

 A. he did not look in more than a few of the 36 bankers boxes;

 B. he spent no more than 20–30 minutes looking at documents in those few boxes that he did review, even though he realized at the time that looking through all the boxes would take "many hours;"

 C. he did not discuss the contents of the boxes with Greg Hanley, even though he talked to Hanley while at his office;

 D. he did not ask whether anyone had made any sort of index or list of the contents of the 36 boxes (Hanley's office in fact had made such an index, which index clearly showed that the documents in those boxes were relevant and responsive to Plante Moran's document request, and contained far more than just accounts receivable records); and

 E. he did not look at any of the descriptive notations that had been written on the boxes themselves, even though he looked *in* some of the boxes (these notations on the boxes contained much the same information that was in the Hanley index).

5. Landau knew, before he signed and served the Trustee's 2003 response to Plante Moran's document request, that he (Landau) did not have adequate information about what was in

96. *See* the discussion in part I–L of this opinion.

the 36 boxes of documents; that is why he had asked the Trustee for authority to have a paralegal review the 36 boxes of documents (which request was denied).

6. Nonetheless, Landau prepared, signed and served the Trustee's 2003 response to Plante Moran's document request, which incorrectly and misleadingly indicated that the "38" boxes of documents at Hanley's office contained only accounts receivable records, even though he, Landau, did not *know* this to be true, and even though he *knew* that he did not *know* this to be true.

7. After Plante Moran served follow-up interrogatories in response to the Trustee's 2003 document request response, asking about missing documents, Landau still did not do any of the things described in item 4 above, any of which would have led him to learn the true contents of the 36 boxes at Hanley's office.

8. Landau prepared, signed, and served the Trustee's 2003 interrogatory answers, erroneously stating, again, that the Trustee did not have many of the documents Plante Moran had requested, even though he (Landau) *knew* that he did not *know* this to be so, because he still *knew* that he did not *know* what was in the 36 boxes of documents at Hanley's office.

9. From that time until the middle of the jury trial more than two years later in 2005, Landau did nothing else meaningful to investigate what documents the Trustee had in the 36 boxes that were in Hanley's office, which were later moved to the Iron Mountain storage facility.

The problems with the Trustee's 2003 document request response and 2003 inter-rogatory answers, which Landau prepared and signed, go far beyond the fact that these responses (1) failed to disclose numerous relevant, requested documents; and (2) erroneously indicated that the "38" boxes of documents at Hanley's office contained only accounts receivable records. Perhaps an even more troubling problem is that the responses clearly implied to Plante Moran not just that the documents did not exist, but also that the Trustee's attorney *had investigated* the documents in the Trustee's possession and *knew* that they did not exist. Put another way, the responses imply that Landau knew what he was talking about when he described what documents the Trustee had and did not have, and when he said that the "38" boxes at Hanley's office were only accounts receivable records. But it is clear now that Landau did *not* really know what he was talking about at all, and that Landau *knew* that he did not.

The Court concludes that Landau's conduct amounted to gross negligence. Landau acted without even slight diligence or care, and in "reckless disregard" of his legal duties. He acted in "reckless disregard" because he created a "substantial and unjustifiable risk of harm" to Plante Moran, and exhibited a conscious indifference to that risk of harm and to his legal duties.

 Landau's grossly negligent conduct is chargeable to his client, the Trustee, in this context. *See Cine Forty–Second Street Theatre Corp., v. Allied Artists Pictures Corp.*, 602 F.2d at 1068 ("[a] litigant chooses counsel at his peril, and here, as in countless other contexts, counsel's disregard of his professional responsibilities can lead to extinction of his client's claim")(citing *Link v. Wabash Railroad Co.*, 370 U.S. 626, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962); other citations omitted); *United States v. Reyes*, 307 F.3d at 458

("[c]ounsel's conduct is also attributable to his client"). And even though he testified at trial that he did not "personally participate in the preparation of responses to discovery," in this case,[97] the Trustee is the plaintiff and as such he is ultimately responsible for the inaccuracy of those discovery responses.

██ In addition to being charged with his attorney's gross negligence, the Trustee, Mark Shapiro, was himself grossly negligent. The facts described in Section I of this opinion show that:

1. The Trustee also received (as a "cc" recipient) the November 7, 2002 e-mail from Reich to Landau, which said that 37 boxes at Hanley's office contained "various Connolly operating books and records," and, thus, more than just Connolly accounts receivable records.

2. Despite this, the Trustee refused his attorney Landau's request for permission to have a paralegal review the 36 boxes at Hanley's office, because he believed and assumed, without a reasonable basis, that the boxes contained only accounts receivable records.

3. *At least as early as June 10, 2004, the Trustee and his law partner, Tracy Clark, had a copy of the Hanley Index, which clearly indicated that the 36 boxes of documents at Hanley's office contained far more than just CNA accounts receivable records, and that those boxes contained many of the types of documents that Plante Moran had requested.*

4. The very revealing Hanley Index was obtained by attorney Clark from Hanley's office, with no apparent difficulty, as part of her work in helping to respond to a document request in another adversary proceeding (the Art Leather preference case).

5. The Trustee personally participated in preparing the discovery responses in the Art Leather case, which were served on Art Leather's attorney on September 2, 2004, *and a copy of the Hanley Index was attached to that discovery response;*

6. *The Trustee admits that he knew, by the end of December 2004, that he had, at the Iron Mountain storage facility, accounting records of CNA other than just accounts receivable records.*

7. While the Trustee says that he did not thereafter disclose these accounting records to Plante Moran because he assumed that they had already been produced to Plante Moran, he presents no good reason for making that erroneous assumption, and he does not claim that he did anything to *verify* that assumption—*e.g.,* he did not talk to his attorney Landau about this at the time; and he did not go back and review his 2003 discovery responses in this case for accuracy.

8. Despite all of the foregoing, the Trustee did not disclose the Hanley Index to his attorney in this case, Landau (who is not a member of the Trustee's law firm,) or disclose to Landau the existence of the documents at issue, or discuss with Landau whether to supplement and correct his earlier discovery responses in this case.

9. Despite all of the foregoing, the Trustee never supplemented his 2003 discovery responses in this case

**97.** *See* the discussion in Section I–K of this opinion.

to disclose the missing documents, and never produced the documents to Plante Moran until the middle of trial, shortly before the June 2005 mistrial.

The Trustee claims essentially that before this problem came to light, in the middle of the June 2005 trial, he never drew the connection(s) to actually realize that he had failed to properly disclose and produce to Plante Moran the many documents at issue. The Court believes the Trustee on this point, but it does not excuse the Trustee's discovery violations. Those violations were the product of gross negligence on the part of the Trustee as well as his attorney, under the definitions of gross negligence discussed above.

## 2. Prejudice

 The next factor is whether Plante Moran "was prejudiced by" the Trustee's "noncompliance." This factor, which the Court must consider before employing the sanction of dismissal, logically encompasses the principle in Civil Rule 37(c)(1) that an offending party's discovery violation is sanctionable "unless" it is "harmless." *See* Fed.R.Civ.P. 37(c)(1). In the Sixth Circuit, the offending party bears the burden of proving such harmlessness. *Roberts v. Galen of Virginia, Inc.*, 325 F.3d 776, 782 (6th Cir.2003). Here the Trustee has not met this burden. To the contrary, the record in this case clearly demonstrates that Plante Moran was greatly prejudiced.

The Trustee failed to disclose or produce, until after nine days of jury trial, *some 36 bankers boxes* of relevant documents, which Plante Moran formally requested almost three years before trial.[98] This prejudiced Plante Moran in at least the following ways:

● it unjustly deprived Plante Moran, an accounting firm publicly accused of professional malpractice, for more than two years, of its rights under the Federal Rules of Civil Procedure to discover relevant documents.[99] As discussed in Section I–E–3 of this opinion, there is no dispute that the undisclosed documents are relevant to this case and to Plante Moran's defense.

● it required Plante Moran to do all of the following things, at great expense and effort, *without having many relevant documents:*

　● to depose witnesses

　● to prepare the report and trial presentation of its expert witness

　● to depose and prepare its trial response to the Trustee's expert witness,

　● to do all of its other, extensive, trial preparation

　● to go to trial before a jury for some nine days (until the Court declared the mistrial); and

---

98. The Trustee claims that well before the trial in this case, Plante Moran's counsel knew, or at least had reason to know, that the Trustee had CNA accounting records that he had not disclosed. This is so, the Trustee argues, because of the involvement of defense counsel's law firm in certain other litigation matters relating to CNA. Plante Moran and its attorneys deny this. And the evidence does not establish the Trustee's claim.

99. The Trustee points out that Plante Moran's counsel was free to inspect the documents in the 36 boxes at Hanley's office early on, and if they had done so, they would have learned of their full contents. But Plante Moran had the right to rely on the accuracy of the Trustee's document request response in deciding not to review these documents, and they chose not to do so because the Trustee's response said they contained only accounts receivable records.

- it required Plante Moran to do all of the following things, also at great expense and effort, *all of which turned out to be a complete waste of time and effort:*

 - to file and argue its first (2003) motion to dismiss (premised on the Trustee's destruction of documents that in fact the Trustee had in his possession all along);

 - to file and argue its 2004 motion in limine (also premised on the Trustee's destruction of documents that in fact the Trustee had in his possession all along);

 - to oppose and argue the Trustee's 2005 motion in limine (which also was premised largely on the Trustee's destruction of documents); and

 - to try this case before a jury for some nine days.

All of this amounts to substantial prejudice to Plante Moran. As explained recently by the district court in *Media Capital Associates, L.L. C. v. Taylor (In re Taylor),* 370 B.R. 122, 129 (E.D.Mich. 2007),

> Prejudice may be found where the adversary encounters substantial difficulty in obtaining information to which it is entitled, *see, e.g., Bank One,* 916 F.2d at 1079, or where the adversary needlessly expends time and money in this effort, *see, e.g., Regional Refuse,* 842 F.2d at 155; *Stamtec, Inc. v. Anson,* 195 Fed. Appx. 473, 481 (6th Cir.2006).

*See also Bass v. Jostens, Inc.,* 71 F.3d at 242 (prejudice found in plaintiff's failure for over a year to completely answer interrogatories and produce documents and tapes relevant to complaint allegations; this "prevented defendant from gathering evidence to support its defenses").

### 3. Prior warning that the discovery violations could lead to dismissal

This factor—whether the Trustee was "warned that failure to comply" with his discovery obligations "could lead to dismissal"—obviously is not present in this case. There was no opportunity or apparent need for the Court to give such a prior warning to the Trustee, because the discovery violations in this case did not come to light until the ninth day of the jury trial. But the absence of this factor is not dispositive. *See United States v. Reyes,* 307 F.3d at 458 ("no one factor is dispositive").

### 4. The possibility of sanctions less drastic than dismissal with prejudice

 In determining whether to dismiss a case due to a discovery violation, the court should consider lesser sanctions. *Regional Refuse Systems, Inc. v. Inland Reclamation Co.,* 842 F.2d 150, 155–56 (6th Cir.1988). But in *Regional Refuse,* the Sixth Circuit noted that "[w]hile it would be inappropriate to dismiss without considering the severity of this sanction and the availability of lesser sanctions, it is not an abuse of discretion to dismiss, even though other sanctions might be workable, if dismissal is supportable on the facts." *Id. See also Bank One of Cleveland, N.A. v. Abbe,* 916 F.2d 1067, 1079 (6th Cir.1990)(affirming court's entry of default judgment against several defendants even though court failed to consider lesser sanctions, because "defendants' lack of response to the court's order to compel discovery ... demonstrates the futility of any lesser sanctions.")

In this case, the Trustee argues that no sanction should be imposed. In the alternative, the Trustee argues that the most severe sanction that could be appropriate is an order requiring the payment of Plante Moran's attorney fees and expenses

caused by the discovery violations. The Trustee contends that this sanction, along with the opportunity for further discovery now that Plante Moran has the previously undisclosed documents, could remedy all possible prejudice suffered by Plante Moran, and that the Trustee should be allowed to try his claim in a new jury trial.

The Court has carefully considered possible sanctions less drastic than dismissal with prejudice, and rejects them. Rather, the Court concludes, for the following reasons, that the appropriate sanction here is dismissal with prejudice of the Trustee's claim against Plante Moran.

**First,** the sanction of dismissal with prejudice is proportionate to the discovery violations. In this case, the Trustee and his attorney exhibited a remarkable level of both indifference and carelessness in their multiple failures to properly respond to Plante Moran's discovery requests. And they did so in a very serious case— serious not only in the amount of the Trustee's claim ($4.8 million according to the Final Pretrial Order,) but also in the nature of the claim (professional malpractice by an accounting firm).

**Second,** the *consequences* of the discovery violations here were very significant. As detailed in the discussion of the "prejudice" factor above, Plante Moran and its attorneys wasted an enormous amount of time and expense doing things that would have to be redone to a significant degree, if a new trial is permitted (including depositions; witness preparation; work regarding expert reports on both sides and expert-related discovery; and a significant amount of trial preparation). And Plante Moran's attorneys wasted an enormous amount of time and expense doing things that turned out to be completely unnecessary (prosecuting their first motion to dismiss in 2003 and prosecuting/defending two motions in limine, all based on evidence destruction that did not occur, and wasting nine days in a jury trial that ended in a mistrial).

In addition, the Trustee's discovery violations caused the undersigned judge (and his predecessor in this case, visiting Judge Perlman,) [100] and court personnel to waste a significant amount of time and effort, dealing with what turned out to be the completely unnecessary motions just referred to and in conducting what turned out to be a useless nine-day jury trial. And, not to be forgotten, the Trustee's discovery violations caused a jury of eight citizens to waste nine days of their time.

**Third,** it is only through a stroke of good luck (from Plante Moran's perspective) that Plante Moran did not suffer the huge injustice of having to try this case to conclusion without ever knowing about or obtaining many bankers boxes of relevant, requested documents. If the Trustee had not called Jeffrey Divian as a witness at trial, or if Divian had not mentioned the Trustee's retention of accounts payable records, or if Plante Moran's attorney had not asked the right follow-up questions in his cross-examination of Divian, Plante Moran and the Court might never have learned of the undisclosed documents.[101]

**Fourth,** an award of attorney fees and expenses is not a very workable sanction in this case. There is no way to measure with any precision the full amount of fees and expenses that Plante Moran wasted in this case because of the Trustee's discovery violations. This is because *some* of Plante Moran's pretrial work in the form

---

**100.** As noted in Section I–H of this opinion, visiting Judge Perlman heard and decided Plante Moran's first (2003) motion to dismiss.

**101.** *See* discussion in Section I–L of this opinion.

of investigation, witness interviews, and depositions, was useful and would have had to be done even if the Trustee had timely disclosed and produced the missing documents. But *some* of that work by Plante Moran was wasted, because it was premised on an incomplete universe of facts, as revealed by the very incomplete body of documents that Plante Moran had. There is no reliable way to distinguish between, and quantify, Plante Moran's usefully-spent time and its wasted time in this respect, which would be necessary to reliably quantify the full amount of an appropriate fee-and-expense sanction here.

**Fifth,** it is not clear that an award of attorney fees and expenses is a reliable sanction here. Even if the Court could reliably calculate the full amount of such a sanction, that amount would surely be very large, and is it not clear that Plante Moran could actually collect such a sanction. Obviously, even if a monetary sanction *might* remedy much of the prejudice Plante Moran has suffered, it could do so only to the extent Plante Moran actually *collected* it.

The CNA bankruptcy estate does have assets, including some $2.8 million in cash at last report,[102] but even if that estate could be made to pay a monetary sanction levied against the Trustee and his attorney, that would take money away from CNA's creditors, who played no role in the Trustee's discovery violations in this case.[103] And if the estate did not pay the monetary sanction, the magnitude of the sanction would raise serious questions about whether Plante Moran could collect it from either the Trustee or his attorney. There is no evidence or suggestion in the record that either the Trustee or his attorney have substantial personal wealth. And it is not clear whether a large monetary award could be collected from any insurance source.[104]

**Sixth,** an award of fees and expenses to Plante Moran could not remedy *at all* the substantial waste of judicial and jury resources caused by the Trustee's discovery violations. As noted above, a good deal of time and effort by the Court and its personnel was completely unnecessary, and therefore *wasted,* on several motions and on a nine-day jury trial. Worse than this, however, is the fact that the Court and the parties imposed on the lives, time, and attention of the eight jury members who sat for nine days of trial, *only to have it all count for nothing.* No attorney fee award, fine, or other sanction other than dismissal with prejudice can remedy such an abuse of the jury members.

**Seventh,** the Court is convinced that the sanction of dismissal with prejudice is nec-

**102.** (*See* Annual Trustee's Report, filed April 30 2007, at 1 (Docket # 662 in the CNA bankruptcy case, Case No. 01–57090)).

**103.** Obviously, the dismissal of this adversary proceeding with prejudice will take an asset away from the CNA estate and its creditors. But it is far from clear whether that asset has any significant net value to the estate, or what that value is. Plante Moran has vigorously defended against the Trustee's claim(s), and no doubt would continue to do so. While the nine-day jury trial was far from completed when it was aborted by mistrial, and there now appears to be a large quantity of additional relevant documents that neither the Trustee nor Plante Moran used in that incom-

plete trial, the Court's observation of that trial and the Court's other exposure to the claims and defenses in this case indicate, at least, that a substantial judgment in favor of the Trustee would be far from certain. And any such judgment would be obtained only after the CNA bankruptcy estate, through the Trustee, incurred substantial further attorney fees and expenses.

**104.** In oral argument, the Trustee's attorney Landau suggested, albeit without any specific support, that a monetary sanction based on a finding of gross negligence would not be covered by insurance. (*See* Tr. at 64–66 (Docket # 159)).

essary to serve as a deterrent against similar carelessness in discovery by parties and attorneys in other cases. This most severe sanction will send the strongest message possible to parties and attorneys who litigate cases, both inside and outside the bankruptcy system. As the United States Supreme Court has noted,

> But here, as in other areas of the law, the most severe in the spectrum of sanctions provided by statute or rule must be available to the District Court in appropriate cases, not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent.

*National Hockey League v. Metropolitan Hockey Club,* 427 U.S. 639, 643, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976).

**Eighth** and finally, the strongest sanction is necessary in this case to uphold the integrity of the discovery process in our civil justice system. The following language, borrowed from another case, applies here:

> If litigants are to have any faith in the discovery process, they must know that parties cannot fail to produce highly relevant documents within their possession with impunity. Parties cannot be permitted to jeopardize the integrity of the discovery process by engaging in halfhearted and ineffective efforts to identify and produce relevant documents.

*Bratka v. Anheuser–Busch Co.,* 164 F.R.D. at 463.

For the reasons just discussed, the Court concludes that the proper remedy is dismissal of this case, with prejudice.

### D. Attorney fees and costs

 As an additional sanction, Plante Moran requests an award of attorney fees and costs, based on the final paragraph of Fed.R.Civ.P. 37(b)(2), Civil Rule 37(c)(1), and Civil Rule 26(g)(3). Plante Moran argues first, that it is entitled to an award of attorney fees and costs under Rule 37(c)(1) because the Trustee failed to supplement his 2003 discovery responses as required by Civil Rule 26(e); and second, that Landau's signature on the Trustee's 2003 discovery responses violated the certification requirements of Civil Rule 26(g)(2) because the discovery responses were false, misleading, and failed to inform Plante Moran about the existence of the other types of CNA accounting records in the Trustee's possession.

 At the outset, the Court notes that any award of monetary sanctions under the rules is discretionary, not mandatory. While the final paragraph of Civil Rule 37(b)(2) arguably requires an attorney fee/expense sanction when it applies,[105] it does not apply here. In this case, Rule 37(b)(2) does not apply directly, because no order to provide discovery was violated. Rather, Rule 37(b)(2) applies only indirectly, and only in part, by incorporation under Rule 37(c)(1). Rule 37(c)(1), quoted in Section III–B of this opinion, does not incorporate the final paragraph of Rule 37(b)(2). Rather, Rule 37(c)(1) only incorporates subsections (A), (B), and (C) of Rule 37(b)(2) as examples of the types of

---

**105.** The final paragraph of that rule states:
> In lieu of any of the foregoing orders or in addition thereto, the court shall require the party failing to obey the order or the attorney advising that party or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the court finds that the failure was substantially justified or that other circumstances make an award unjust.

Fed.R.Civ.P. 37(b)(2).

sanctions a court *may* impose to remedy a party's failure to supplement and correct a discovery response as required by Rule 26(e)(2). Rule 37(c)(1) contains its own, discretionary attorney fee sanction, discussed below. Thus, Rule 37(b)(2)'s final paragraph does not apply here.

Both Rule 37(c)(1) and Rule 26(g)(3), however, do apply here, and permit an award of attorney fees and expenses as a sanction for a party's discovery violation. By the use of the word "may," however, these rules make such a monetary sanction discretionary.[106]

For the reasons already discussed, the Court has concluded that dismissal with prejudice is the appropriate remedy to impose for the discovery violations in this case. Given that, the Court concludes that it is neither necessary nor appropriate to impose, as an *additional* sanction, an award of attorney fees and expenses to Plante Moran.

Rather, such an additional sanction would be overkill. Plante Moran is already obtaining the dismissal with prejudice of the Trustee's malpractice claim. Plante Moran is obtaining that result without having to try the claim on its merits and to a conclusion, and without having to obtain a defense verdict from a jury. Plante Moran most likely would have had to incur at least as much in attorney fees and expenses in this case as it has incurred so far, even if there had been no discovery violations, to get to the same end result— *i.e.*, dismissal with prejudice.

It is true that Plante Moran has incurred fees and expenses in this case that it would not have incurred but for the discovery violations.[107] But Plante Moran did *not* have to incur the fees and expenses of fully digesting the 36 banker's boxes of documents, and incorporating those documents into their expert's report and opinion and into its trial preparation. And while Plante Moran did spend nine days in a jury trial, it did not incur the fees and expenses of completing that trial, which would have taken many more days of trial time. And Plante Moran is obtaining a result—dismissal with prejudice—that it might not have obtained at all had it been required to run the risk of putting the case to a jury for decision.

From an economic standpoint, then, it appears that Plante Moran most likely will be at least as well off with the result it obtains today—dismissal with prejudice but no award of attorney fees and expenses—as it would have been if the Trustee and his attorney had not committed the discovery violations at issue. To give Plante Moran the additional remedy of attorney fees and expenses, then, would be too much.

## IV. Conclusion

For the reasons stated in this opinion, the Court will dismiss this adversary proceeding with prejudice. To this extent, Plante Moran's motion will be granted. To the extent the motion seeks other relief, including a sanction of attorney fees

**106.** Those rules state in pertinent part: "[T]he court ... shall impose ... an appropriate sanction ... which *may* include an order to pay the amount of reasonable expenses ... including a reasonable attorney's fee." Fed. R.Civ.P. 26(g)(3). "[T]he court ... *may* impose other appropriate sanctions. In addition to requiring payment of reasonable expenses, including attorney's fees, caused by the failure, these sanctions may include...." Fed. R.Civ.P. 37(c)(1).

**107.** *See* the discussion of work Plante Moran's attorneys did that turned out to be wasted time, in the discussion of the "prejudice" factor in Part III–C–2 of this opinion.

and expenses, the motion will be denied. The Court will enter an appropriate order.